1  BOERSCH SHAPIRO LLP
   Martha Boersch (CA State Bar No. 126569)
2  mboersch@boerschshapiro.com
   235 Montgomery Street, Suite 835
3  San Francisco, CA 94104
   Telephone: (415) 500-6640
4
   Attorney for Defendant
5  PURVIS ELLIS

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10                          **OAKLAND DIVISION**

11

12  UNITED STATES OF AMERICA,              Case No. CR13-00818 PJH

13          Plaintiff,                     **MOTION TO SUPPRESS PRETRIAL AND
                                           IN-COURT IDENTIFICATIONS**
14          v.
                                           Hearing Date: May 13, 2015
15  PURVIS LAMAR ELLIS, DEANTE
    TERRANCE KINCAID, DAMIEN EDWARD        Hearing Time: 1:30 p.m.
16  MCDANIEL, and JOSEPH PENNYMON
                                           Trial Date:  TBD
17          Defendant.

18

19  TO:    UNITED STATES OF AMERICA, PLAINTIFF; AND MELINDA HAAG, UNITED
           STATES ATTORNEY; AND JOSEPH ALIOTO, ASSISTANT UNITED STATES
20         ATTORNEY:

21         PLEASE TAKE NOTICE that on May 13, 2015 at 1:30 p.m., or as soon thereafter as the

22  matter may be heard, in the courtroom of the Honorable Phyllis Hamilton, United States District

23  Judge, defendant Purvis Ellis, by and through his counsel of record, Martha Boersch, will move this

24  Honorable Court for an order suppressing two pretrial identifications and any proposed in-court

25  identification testimony.  This motion is made pursuant to the Due Process Clause of the Fifth

26  Amendment to the United States Constitution, and is based upon the following Memorandum of

27  Points and Authorities, all files and records in the case, and such evidence and argument as may be

28  presented at the hearing.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

    I.     THE SHOOTING ........................................................................... 3

    II.    THE PHOTOSPREAD LINEUP ................................................... 4

    III.   THE PHYSICAL LINEUP VIDEO ............................................. 5

    IV.   THE JANUARY 21 SHOOTING ................................................. 6

ARGUMENT ............................................................................................................ 7

    I.     LEGAL STANDARD .................................................................... 7

    II.    PHOTOSPREAD AND VIDEO OF PHYSICAL LINEUP SHOWN TO THE WITNESS WERE UNNECESSARILY SUGGESTIVE AND RESULTED IN AN UNRELIABLE IDENTIFICATION ............................................... 9

        A.    PHOTOSPREAD AND VIDEO OF PHYSICAL LINEUP WERE BOTH UNDULY SUGGESTIVE ............................................. 9

            1.    Photospread Was Unduly Suggestive ................................... 10

            2.    Video of Physical Lineup Was Unduly Suggestive ............. 11

        B.    USE OF THE SUGGESTIVE PHOTOSPREAD AND VIDEO LINEUP WERE NOT NECESSARY ................................. 12

        C.    THE RESULTING IDENTIFICATIONS WERE UNRELIABLE ................... 13

            1.    Witness's Opportunity to View Criminal at the Time of the Crime ...... 13

            2.    Witness's Degree of Attention ............................................. 14

            3.    Accuracy of the Witness's Prior Description of the Driver ... 14

            4.    Level of Certainty Demonstrated by Witness at Time of Identification ............................................. 15

            5.    Length of Time between the Crime and the Confrontation ... 15

        D.    THE IDENTIFICATIONS MUST BE SUPPRESSED ................. 16

        E.    IN-COURT IDENTIFICATION MUST ALSO BE PRECLUDED ................. 16

        F.    USE OF THE RECORDED VIDEO LINEUP VIOLATED MR. ELLIS'S SIXTH AMENDMENT RIGHT TO COUNSEL ............................................. 17

CONCLUSION ....................................................................................................... 18

MOTION TO SUPPRESS PRETRIAL AND
IN-COURT IDENTIFICATIONS
Case No. CR13-00818 PJH

**TABLE OF AUTHORITIES**

**Cases**

*Foster v. California*,
   394 U.S. 440 (1969) .............................................................................................9, 10, 12

*Gregory Bey v. Hanks*,
   332 F.3d 1036 (7th Cir. 2003) ....................................................................................11, 12

*Heath v. Hill*,
   397 Fed. Appx. 308, 2010 WL 3678658, at *1 (9th Cir. Sep. 17, 2010) ........................11

*Israel v. Odom*,
   521 F.2d 1370 (7th Cir. 1975) .............................................................................................9

*Manson v. Brathwaite*,
   432 U.S. 98 (1977) ..........................................................................................8, 13, 14, 16

*Moore v. Illinois*,
   434 U.S. 220 (1977) ...........................................................................................................17

*Neil v. Biggers*,
   409 U.S. 188 (1972) .....................................................................................................passim

*Perry v. New Hampshire*,
   132 S.Ct. 716 (2012) ....................................................................................................8, 16

*Pineda-Oliva v. Hedgpeth*,
   375 Fed. Appx. 697, 2010 U.S. App. LEXIS 7580, at * 1 (9th Cir. Apr. 13, 2010)........11

*Raheem v. Kelly*,
   257 F.3d 122 (2nd Cir. 2001) .................................................................................9, 10, 14, 15

*Simmons v. United States*,
   390 U.S. 377 (1968) ..................................................................................................8, 14, 16

*Stovall v. Denno*,
   388 U.S. 293 (1967) .............................................................................................................8

*Thigpen v. Cory*,
   804 F.2d 893 (6th Cir. 1986) .............................................................................................14

*United States v. Amrine*,
   724 F.2d 84 (8th Cir. 1983) ...............................................................................................17

*United States v. Bagley*,
   772 F.2d 482 (9th Cir. 1985) .............................................................................................10

*United States v. Barker*,
   988 F.2d 77 (9th Cir. 1993) ...............................................................................................17

*United States v. Beck*,
   418 F.3d 1008 (9th Cir. 2005) ...........................................................................................10

*United States v. Brownlee*,
   454 F.3d 131 (3rd Cir. 2006) ...............................................................................................8

*United States v. Burnette,*
  698 F.2d 1038 (9th Cir. 1983) ...........................................................................16

*United States v. Eltayib,*
  88 F.3d 157 (2nd Cir. 1996) ...............................................................................10

*United States v. LaPierre,*
  998 F.2d 1460 (9th Cir. 1993) .......................................................................17, 18

*United States v. Montgomery,*
  150 F.3d 983 (9th Cir. 1998) ....................................................................9, 12, 13

*United States v. Russell,*
  532 F.2d 1063 (6th Cir. 1976) ............................................................................13

*United States v. Smith,*
  429 F.Supp.2d 440 (D.Mass. 2006) ....................................................................14

*United States v. Wade*,
  388 U.S. 218 (1967) ....................................................................................passim

**Other Authority**

Clifford & Hollin, *Effects of the Type of Incident and the Number of Perpetrators on Eyewitness Memory*, 66 J. Applied Psychol. 364 (1981) ...........................................14

Gary L. Wells & Elizabeth A. Olson, *Eyewitness Testimony*, 54 Ann. Rev. Psychol. 277 (2003) .......15

National Academy of Sciences, *Identifying the Culprit: Assessing Eyewitness Identification,* October 2, 2014 ...........................................................................................8

Neil Brewer, Amber Keast, & Amanda Rishworth, *The Confidence-Accuracy Relationship in Eyewitness Identification: The Effects of Reflection and Disconfirmation on Correlation and Calibration*, 8 J. Experimental Psych. 44 (2002) ...............................................15

Steven Penrod & Brian Cutler, *Witness Confidence and Witness Accuracy: Assessing Their Forensic Relation*, 1 Psych., Pub. Pol. & Law 817 (1995) ....................................15

The Innocence Project, *Eyewitness Misidentification,*
  http://www.innocenceproject.org/understand/Eyewitness-Misidentification.php ............8

United States Constitution, Fifth Amendment .............................................................8, 9

United States Constitution, Sixth Amendment ..........................................................17, 18

Weiten, *Psychology: Themes and Variations, Briefer Version,* 230 (7th ed. 2008).............14

In January 2013, defendant Purvis Ellis was arrested and charged by the Alameda County District Attorney's office with being a felon in possession of a firearm after several guns, including two allegedly belonging to a police officer who had been shot in the wrist, were allegedly recovered from an apartment where the Oakland Police Department claimed Mr. Ellis resided. The three co-defendants in the instant federal case were charged in a separate case by the D.A. in connection with the same shooting. In May 2013, after then-counsel for Mr. Ellis demanded that the State produce the affidavit for the search warrant for what was alleged to have been Mr. Ellis's apartment, the D.A. dropped all charges against Mr. Ellis and he was released from custody.

Several months later, in December 2013, the federal government indicted Mr. Ellis and the three co-defendants on RICO charges, alleging that they were part of an Oakland gang called "Sem City," and that, *inter alia*, they were involved with a shooting at a bus stop on January 20, 2013. The instant motion pertains to the government's allegation that Mr. Ellis allegedly drove the getaway car after the January 20 shooting.

On January 20 at approximately 3:45 p.m., a witness allegedly described seeing two suspects chase after and shoot a victim near the bus stop at 5912 Foothill Boulevard in Oakland. The witness allegedly told officers from the Oakland Police Department ("OPD") that, after the shooting, the two suspects drove off in a white, four-door sedan driven by a third suspect. OPD quickly determined that the car had been rented by a Laron Means. The witness, who claimed to have been inside a restaurant at the time, allegedly described the driver as a dark-skinned African American with long dreadlocks, a thick mustache, and a thin goatee. OPD prepared a six-pack photospread, which did not include a photograph of Mr. Ellis, and showed it to the witness later that night. The witness selected Laron Means, who had short-cropped hair, no dreadlocks, and no discernable goatee or mustache, and who was identified by OPD hours earlier as the person who had rented the car alleged to be the getaway vehicle.

The following night, more than 30 hours after the shooting, OPD, apparently having concluded that they wanted the witness to identify the getaway driver as someone other than Laron Means, presented him with another photospread. This time the witness indicated with obvious uncertainty

that Mr. Ellis, who was included in the photospread, might have been the driver. Although that uncertainty undermines the reliability of the identification, the identification was rendered unconstitutional because the photospread was unduly and unnecessarily suggestive: Mr. Ellis's skin is strikingly darker than that of the other five individuals – indeed, three of those individuals appear to be of a different race than Mr. Ellis; three of the five other individuals do not have long dreadlocks; and none has a thick mustache. Only Mr. Ellis matched most of the traits described by the witness after the shooting, rendering the photospread patently deficient. The witness's initial identification, on the night of the shooting, of a different person, conveniently with the name of the person believed to have rented the car, only further undermines the subsequent identification of Mr. Ellis. That identification from the photospread lacks the necessary indicia of reliability and must be suppressed.

After the witness was shown the photospread, he indicated that he would like to see a profile view of Mr. Ellis, presumably to add some modicum of certainty to his choice of Mr. Ellis as the driver. Three days after the shooting, OPD arranged to meet the witness at North County Jail, where Mr. Ellis was under arrest, in order to conduct a physical lineup. The witness, however, never showed up. Instead, officers from OPD made a video recording of the physical lineup. Not until the end of May 2013, however – more than *four months* after the shooting and the photospread identification, and five days after Mr. Ellis was released because the charges against him were dropped – did the officers arrange to meet with the witness and show him the video of the physical lineup. In response to the video, the witness put a "?" over the position in the lineup occupied by Mr. Ellis and told the officers that he thought Mr. Ellis "resembled" the driver, but failed to make a positive identification.

Like the photospread, the video of the physical lineup lacks the necessary indicia of reliability and must be suppressed. Most obviously, the identification of Mr. Ellis in the video lineup was irreversibly tainted by the witness's previous identification of Mr. Ellis in the suggestive photospread. In other words, because the witness first identified Mr. Ellis in a photospread that was unduly and unnecessarily suggestive, any subsequent identifications by the witness of Mr. Ellis must be presumed to be the result, in whole or in part, of the first identification. In addition, the four-month delay, combined with the utter lack of certainty by the witness, erases any remaining indicia of reliability. Finally, the video lineup itself, like the photospread, was unduly and unnecessarily suggestive.

MOTION TO SUPPRESS PRETRIAL AND
IN-COURT IDENTIFICATIONS
Case No. CR13-00818 PJH

The introduction of the photospread and video lineup identifications, as well as any in-court identifications of Mr. Ellis by the witness, would violate his Due Process rights under the Fifth Amendment. All such evidence must be suppressed.

**FACTUAL BACKGROUND[1]**

**I.    THE SHOOTING**

At approximately 3:45 p.m. on January 20, 2013, a witness allegedly described seeing two suspects run after and then shoot a man who had been waiting at the bus stop near 5912 Foothill Boulevard in Oakland. In a statement given at 4:35 p.m., the witness claims to have been at the bus stop at 3:30 p.m. the day of the shooting. Immediately before going to the bus stop, the witness claims to have been in C-Town Smoke Shop, located at 2550 Seminary Avenue at Fortune Boulevard. While in the store, he claims to have seen two African American men, one approximately 20 years old and the other between 17 and 20 years old, speaking animatedly to each other. The witness then claims to have left the store and walked to the corner of Seminary Avenue and Foothill Boulevard.

Eventually, according to the witness, he saw the older individual leave the store, walk to the corner of Seminary Avenue and Foothill Boulevard and look across Foothill to the bus stop. The older individual then returned to the store, nodded to the younger individual, and they both then left the store and went around the corner to Fortune Boulevard. A few seconds later, according to the witness, he saw the younger individual ("Suspect 1") run past the witness on Foothill Boulevard towards Seminary Avenue while holding a pistol. When Suspect 1 reached the corner of Foothill Boulevard and Seminary Avenue, the witness claims to have seen him start shooting at the bus stop across Foothill Boulevard.

The witness then claims that he went into what was at the time Tom's Kitchen, located at 5907 Foothill Boulevard, on the corner of Foothill Boulevard and Seminary Avenue. The witness claims to have looked out the window and seen the eventual victim running away from Suspect 1 and also to have seen a second suspect ("Suspect 2") running on Seminary Avenue toward the bus stop from the

---

[1] The factual allegations set forth herein are derived primarily from police reports. By reciting those allegations here, Mr. Ellis does not concede the truth or accuracy of any of those facts, and indeed he does and will dispute the truth and accuracy of such factual allegations.

direction of 60th Avenue.  Suspect 2 also allegedly began shooting at the fleeing victim (although this account is contradicted by OPD ballistics analysis).  The witness then claims to have seen both suspects get into a white four-door car, which, according to the witness, was parked across Foothill Boulevard and Seminary Avenue on Walnut Street.  The witness described the driver of the vehicle as a "black male in his 20's" who "was dark skinned with dreads past his shoulders, and he had a thick mustache and a thin goatee."  Ex. A [Reports-Documents ("RD") 000012-13, 000024-26][2].  OPD also claimed that the witness provided it with the license plate of the car.  From the license plate, the police determined that the car was a Hertz rental car rented to a Laron Means.

## II.      THE PHOTOSPREAD LINEUP

Based on the determination that the car was rented to Laron Means, OPD Officer Randolph Brandwood compiled a photospread with six photographs, including Means and five other individuals. Ex. B [RD 000348].  At approximately 10:00 p.m. on the night of the shooting, OPD Officers Eric Milina and Brandwood met with the witness at his home and showed him the photospread.[3]  Ex. C [RD 000034-36] Ex. B.  The witness circled the man in position number 5 of the photospread, Laron Means, and wrote: "Looks like driver of the getaway car, white four door."  *Id*.  The witness also stated that "[t]he only thing different is driver had dreads, mustache, and small goatee," even though Mr. Means has a mustache and small goatee in his picture.  *Id*.  Those statements are preceded by the cryptic handwritten statement "Did not," which completes the type-written statement "I have examined each of the photographs and identified photo number 5 as the person who."  Ex. C at RD 000034.  The officers asked the witness to concentrate on the face, not the hair, and the witness allegedly told the officers that the person in position number 5 looked like the driver of the getaway car.  Exs. B & C.

The next evening, at approximately 10:30 p.m., Officer Milina claims in his typewritten report

---

[2] References to page numbers in the exhibits refer to the Bates-stamped page numbers at the bottom right corner of each page.

[3] The Government has yet to identify the witness.

to have again met with the witness at his home.[4]  Ex. D [RD 000037-39, 000350].  Worth noting, in

discovery produced in the state court proceedings but not by the government in the federal case,

Officer Milina's handwritten notes, presumably made contemporaneously with the events in question,

make no mention of Officer's Milina's second meeting with the witness at 10:30 p.m.  This second

time, Officer Milina allegedly showed the witness a photospread with six photographs that included a

photograph of Mr. Ellis.  *Id.* at RD 000350.  According to the police report, the witness gave a "partial

identification by pointing to the #3 position [Mr. Ellis] and stating that he resembled the driver of the

getaway car."  *Id.*  In his statement, the witness did not make a positive identification, and instead

wrote that position number three "resemble[d] driver of the getaway car," and wrote that he would

"like to see [a] profile."  *Id.*

> The photospread itself contained photographs of Mr. Ellis and five other individuals.  *Id.*  The

five other individuals have noticeably lighter skin than Mr. Ellis, and three appear to be of a different

race altogether.  *Id.*  Mr. Ellis is the only individual with dark skin, even though the witness

specifically told the police immediately after the shooting that the driver had dark skin.  Exs. D & A.

Further, four of the five other individuals – positions two, four, five, and six – do not have long

dreadlocks, as the witness claimed to have seen.  Ex. D at RD 000038.  Finally, none of the other five

individuals has a "thick mustache and thin goatee," as the witness stated immediately after the

shooting, and it is impossible to accurately describe any facial hair Mr. Ellis may have had, given the

poor quality of the photograph.  Ex. A at RD 000012-13, 0000026.

## III.    THE PHYSICAL LINEUP VIDEO

> In response to the witness's request to see a profile of Mr. Ellis, who had been charged and

was incarcerated at that time, OPD agreed to meet the witness on January 23, 2013 at North County

jail, where Mr. Ellis was under arrest, to conduct a live physical lineup.  At approximately 3:00 p.m.,

OPD Officers Milina, Brandwood and Trevino went to North County jail, but the witness never

showed up.  Officer Trevino instead made a video recording of the physical lineup, which included

---

[4] It is clear that Officer Milina was meeting with the same witness who, the night before, identified Laron Means as the driver of the getaway vehicle, as Officer Milina states in his report that he "reminded the witness of the photo lineup waiver."  Ex. D at RD 000350.

Mr. Ellis, to show to the witness at another time. Ex. E RD 000351, and video of physical lineup.[5]

More than four months later – and seven days after the state charges against him were dropped and Mr. Ellis was released from jail – Officer Milina, on May 28, 2013, finally attempted to contact the witness by sending an email to his place of work and by visiting his house. Ex. F [RD 000354]. Officers Milina and Rosin eventually were able to meet with the witness and play the video lineup for him. *Id.* According to Officer Milina's report, the witness watched the lineup video and then filled out a Lineup Card. *Id.* The witness placed a "?" on position number four and wrote "I think number four resembles the driver." Ex. G [RD 000315-16]. The witness did not otherwise positively identify the person in position number four as the driver. *Id.* Position number four was Mr. Ellis. Ex. E. Other than Mr. Ellis, none of the other individuals in the video lineup were also in the photospread.

## IV.    THE JANUARY 21 SHOOTING

At approximately 6:15 p.m. on January 21, 2013, the day after the shooting at the bus stop, OPD Officer Eric Karsseboom drove, without permission or a search warrant, down the private driveway of an apartment complex located at 1759 Seminary Ave. in Oakland and into the rear parking area of the building. Officer Karsseboom, who, by all appearances, was off-duty and was not driving a marked police car or wearing a police uniform, apparently had received a tip from an informant that the getaway car from the shooting the day before was located in the parking area. Officer Karseboom turned his car around in the parking area and drove back down the driveway of the apartment building towards Seminary Ave., only to discover that a gate was about to be closed across the entrance of the driveway. Officer Karsseboom was then allegedly confronted by one or more suspects who demanded to know who he was and what he was doing there. Officer Karsseboom allegedly told the suspect(s) that he was "looking for a female." The suspect(s) apparently did not believe Officer Karsseboom, and, after the suspects saw a firearm sitting within reach of Officer Karsseboom, the conversation escalated into a physical altercation during which Officer Karsseboom claimed to have been hit in the head and shot in his left wrist before the suspect(s) fled.   During the struggle, the suspects are alleged to have taken two pistols from Officer Karsseboom. Mr. Ellis was

---

[5] A CD with a copy of the video of the physical lineup will be provided to the Court with the courtesy chambers copy of the motion.

MOTION TO SUPPRESS PRETRIAL AND
IN-COURT IDENTIFICATIONS
Case No. CR13-00818 PJH

not identified by Officer Karsseboom as being involved in the altercation.

At approximately 8:30 p.m. on the night Officer Karsseboom was shot, OPD claims that it developed reasons to suspect that Mr. Ellis allegedly was involved in the shooting of Karsseboom, that Karsseboom's pistols were in Apartment 212, and that Mr. Ellis allegedly resided in that apartment.[6]  The apartment building was surrounded by OPD the entire night of January 21 and the morning of January 22.  OPD claims to have discovered Officer Karsseboom's two pistols as well as a third pistol with Karsseboom's and someone else's blood and DNA on it sometime early in the morning of January 22 in Apartment 212.[7]  At some point on the morning of January 2, 2013, Mr. Ellis and several other individuals were detained by OPD after leaving apartment 112.

Mr. Ellis was charged in state court with being a felon in possession of a firearm.  Mr. Ellis's attorney in the state-court proceedings made repeated requests for the affidavit to the search warrant for apartment 212.  Eventually, Mr. Ellis's then-attorney filed a motion seeking the affidavits.  Not long after that motion was filed, and before the search warrant affidavits were produced, the Alameda County District Attorney's office dismissed all charges against Mr. Ellis and he was released from custody.  In December 2013, Mr. Ellis was indicted along with the three co-defendants in the present case by the federal government.  (Doc. 1.)

## ARGUMENT

### I.   LEGAL STANDARD

"The vagaries of eyewitness identification are well known; the annals of criminal law are rife with instances of mistaken identification."  *United States v. Wade*, 388 U.S. 218, 228 (1967).  "[T]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages

---

[6] No evidence produced by the government has connected Mr. Ellis to the shooting, but the fact that, at approximately 8:00 p.m., OPD believed that he was connected to it likely explains why a photospread including Mr. Ellis was created and shown by Officer Milina, at approximately 10:30 p.m. on the same night, January 21, 2013, to the witness of the bus stop shooting who had already identified Laron Means as the getaway driver.  In other words, it appears that the only reason Mr. Ellis became a suspect in the January 20 shooting was because OPD believed he was involved in the January 21 shooting of one of its own.

[7] Mr. Ellis is contemporaneously moving to suppress all evidence discovered in Apartment 212 on the grounds that the search warrants were obtained in a manner that violated Mr. Ellis's Fourth Amendment rights.

of justice than any other single factor – perhaps it is responsible for more such errors than all other factors combined." *Id.* (citation and internal quotation marks omitted). The Innocence Project has found that "[e]yewitness misidentification is the single greatest cause of wrongful convictions nationwide, playing a role in 72% of convictions overturned through DNA testing." http://www.innocenceproject.org/understand/Eyewitness-Misidentification.php (last visited January 6, 2015.)

The Due Process Clause of the Fifth Amendment is violated when an individual is identified as the perpetrator of a crime pursuant to procedures that are so unnecessarily suggestive as to give rise to a very substantial likelihood of misidentification. *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see also Stovall v. Denno*, 388 U.S. 293, 302 (1967); *Neil v. Biggers*, 409 U.S. 188 (1972). "Where the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." *Perry v. New Hampshire*, 132 S.Ct. 716, 719 (2012); *see also Manson v. Brathwaite*, 432 U.S. 98, 100-14 (1977). Misidentifications are one of the leading causes of wrongful convictions in this country, and improper influence by law enforcement is one of the leading causes of misidentifications. *See United States v. Brownlee*, 454 F.3d 131, 141-42 (3rd Cir. 2006); *see also* October 2, 2014, report by National Academy of Sciences, titled "Identifying the Culprit: Assessing Eyewitness Identification," which highlights the inherent unreliability of eyewitness identifications and urges uniform adoption of numerous procedural safeguards to help make such identifications less unreliable.[8]

The eyewitness identification of Mr. Ellis in this case was tainted by an unduly suggestive and highly prejudicial photospread and video lineup in which Mr. Ellis was the only individual who resembled the description of the suspected getaway driver provided by the witness. The identifications of Mr. Ellis have no indicia of reliability, and it would violate Due Process to allow such a tainted, suggestive, and prejudicial form of identification to be used at trial.

/ / /

/ / /

---

[8] Available at http://www.nap.edu. (Last visited January 5, 2015.)

MOTION TO SUPPRESS PRETRIAL AND
IN-COURT IDENTIFICATIONS
Case No. CR13-00818 PJH

II.    **PHOTOSPREAD AND VIDEO OF PHYSICAL LINEUP SHOWN TO THE WITNESS WERE UNNECESSARILY SUGGESTIVE AND RESULTED IN AN UNRELIABLE IDENTIFICATION**

Evidence of a witness's out-of-court identification of a criminal suspect violates the Fifth Amendment's guarantee of due process where (1) the identification procedure is suggestive, (2) the suggestive procedure is not "imperative" under the circumstances, and (3) the resulting identification is unreliable. *Neil v. Biggers*, 409 U.S. 188, 198 (1972); *United States v. Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998).

A.    **PHOTOSPREAD AND VIDEO OF PHYSICAL LINEUP WERE BOTH UNDULY SUGGESTIVE**

"[T]he conduct of identification procedures may be so unnecessarily suggestive and conducive to irreparable mistaken identification as to be a denial of due process of law." *Foster v. California*, 394 U.S. 440, 442 (1969) (internal quotation marks and citations omitted). The Supreme Court has noted that "a major factor contributing to a high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to the witnesses for pretrial identifications." *United States v. Wade*, 388 U.S. 218, 228 (1967). "The dangers for the suspect are particularly grave when the witnesses' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest." *Id.*

"An identification procedure is suggestive when it emphasizes the focus upon a single individual, thereby increasing the likelihood of misidentification." *Montgomery*, 150 F.3d at 992; *see also Raheem v. Kelly,* 257 F.3d 122, 134 (2nd Cir. 2001) ("A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not."); *Israel v. Odom*, 521 F.2d 1370, 1374 (7th Cir. 1975) ("Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the danger of misidentification."). This increased likelihood occurs where the suspect stands out from the other people in the lineup or photospread in critical respects, such as his height and/or by wearing clothing that is similar to that worn by the robber. *Foster*, 394 U.S. at 442-43 (lineup was unduly suggestive and violated due process when the defendant stood out from the

other participants by the contrast of his height and by the fact that he was the only participant wearing a jacket similar to that worn by the robber); *see also Wade*, 388 U.S. at 232-33 (citing examples of cases involving suggestive lineups where "a black-haired suspect was placed among a group of light-haired persons, tall suspects have been made to stand with short nonsuspects," and when "only the suspect was required to wear distinctive clothing which the culprit allegedly wore").

### 1.  Photospread Was Unduly Suggestive

In the photo lineup, Mr. Ellis is noticeably darker-skinned than the other five individuals, even though the witness had stated immediately after the shooting that the driver had dark skin. Ex. D at RD 000038. Indeed, three of the five other individuals appear to be of a different race than Mr. Ellis. *Id.* The eyewitness was therefore primed to select Mr. Ellis, regardless of whether he was the actual driver. *United States v. Eltayib*, 88 F.3d 157, 166 (2nd Cir. 1996) (lineup was suggestive because the defendant "was made to stand out by his skin color," as he was a Sudanese man with a light complexion, while the other men had skin tones that ranged from medium to dark).

Further, four of the other five individuals, position numbers two, four, five, and six do not have long dreadlocks, as at the witness claimed to have seen. Exs. D & A. This is yet another way in which Mr. Ellis was made to stand out from the other lineup participants in a manner that were important to the eyewitness. *See Raheem*, 257 F.3d at 134; *compare United States v. Beck*, 418 F.3d 1008 (9th Cir. 2005) (photospread was not suggestive where all pictures were of men in the same age range, with similar skin, hair, and eye coloring, and each depicted the subject wearing distinctive glasses).

Mr. Ellis was "made to stand out" through the darkness of his skin tone and the length and style of his hair. As such, the photospread was unduly suggestive. Either one of those flaws alone would have made the photospread unduly suggestive. Taken together, this plainly was an impermissible photospread that, "[i]n effect…said to the witness, 'This is the man.'" *Foster*, 394 U.S. at 443. The suggestive elements of the photospread "made it all but inevitable" that the witnesses would identify Mr. Ellis, whether or not he was the driver, due to the color of his skin and his hairstyle. *Foster*, 394 U.S. at 444; *United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985) ("Photographic procedures which emphasize the focus upon a single individual increase the danger of

MOTION TO SUPPRESS PRETRIAL AND
IN-COURT IDENTIFICATIONS
Case No. CR13-00818 PJH

misidentification."); *Gregory Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003) (a photo that stands out from the others "implicitly suggests to the witness that 'this is the man'").

The photospread was suggestive for the additional reason that the record is devoid of any indication that OPD admonished the witness that the getaway driver might not be in the photospread lineup. Case law in this Circuit has expressly recognized the significance for the requisite due-process analysis of the failure to admonish a witness that the suspect may not be in the lineup. In *Heath v. Hill*, 397 Fed. Appx. 308, 2010 WL 3678658, at *1 (9th Cir. Sep. 17, 2010) (unpublished), the court affirmed the district court's grant of habeas relief. It specifically found objectively unreasonable the state court's finding that the photographic identification procedure used in that case had not been impermissibly suggestive, relying in part on the fact that "the record contains no indication that [the eyewitness] was admonished either orally or in writing that he was not required to select an individual from that array." *Id.* at *2.

*Pineda-Oliva v. Hedgpeth*, 375 Fed. Appx. 697, 2010 U.S. App. LEXIS 7580, at * 1 (9th Cir. Apr. 13, 2010), is to precisely the same effect. There, again upholding a district court's grant of habeas relief, the Ninth Circuit concluded that the California state courts unreasonably applied Supreme Court precedent in finding that a challenged photographic identification had not been impermissibly suggestive. This time, the Ninth Circuit relied in part on the fact that "the detectives conducting the photograph identification procedure did not tell [the eyewitness] that the photographic lineup, consisting of six photographs, might or might not contain a photograph of the suspect." *Id.* at 698.

### 2. Video of Physical Lineup Was Unduly Suggestive

The video of the physical lineup was also unduly suggestive.[9] First, nothing in the record indicates that the witness was admonished that the getaway driver might not be in the video lineup. *Heath*, 397 Fed. Appx. at 308; *Pineda-Oliva*, 375 Fed. Appx. at 697. Second, Mr. Ellis is the only

---

[9] The federal government has not produced a copy of the video of the physical lineup. Mr. Ellis has a copy that was produced in the state-court proceedings before that case was dismissed. Mr. Ellis has included screen-shots of the video as exhibits to this motion and will provide the Court with a copy of the actual video upon the Court's request.

MOTION TO SUPPRESS PRETRIAL AND
IN-COURT IDENTIFICATIONS
Case No. CR13-00818 PJH

suspect who generally fits the description given by the witness. He is darker-skinned and substantially taller than most of the other individuals and is the only one with a pronounced mustache and goatee. Ex. E. The individual in position number one is shorter and lighter-skinned than Mr. Ellis and has no real mustache and very little facial hair. (*Id.*) The individual in position number two is also lighter-skinned and is much shorter than Mr. Ellis. (*Id.*) Unlike Mr. Ellis, he has a full beard. (*Id.*) The individual in position number three is also shorter and also has a full beard, not a mustache and goatee. (*Id.*) Although the individual in position number five is close to Mr. Ellis's height, he too has a full beard and is quite a bit older, even though the witness described the driver of the vehicle as a "black male in his 20's." *Id.*; Ex. A. Finally, the individual in position number four has almost no facial hair, his dreadlocks are substantially shorter than Mr. Ellis's, and his skin-tone is substantially lighter than Mr. Ellis's. (*Id.*)

The cumulative impact of the different appearances of the other individuals in the recorded physical lineup made the lineup unduly suggestive as Mr. Ellis unquestionably was made to stand out, something the law forbids. *Foster*, 394 U.S. at 444; *Bagley*, 772 F.2d at 493; *Gregory Bey*, 332 F.3d at 1045.

### B.    USE OF THE SUGGESTIVE PHOTOSPREAD AND VIDEO LINEUP WERE NOT NECESSARY

"An identification procedure is unnecessarily suggestive when its use is not imperative." *Montgomery*, 150 F.3d at 992; *see also Biggers,* 409 U.S. at 198 ("Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous."). The use of a suggestive identification procedure is not imperative if the government has "ample time to prepare a non-suggestive photographic array." *Montgomery*, 150 F.3d at 992-93.

In this case, the photospread was shown to the witness on January 21, 2013. But the government surely had "ample time to prepare a non-suggestive photospread," *id*., as it waited until the end of *May* to show the witness the video recording of Mr. Ellis's physical lineup. The use of the suggestive photospread was anything but necessary.

For the same reason, the use of the suggestive video recording of the physical lineup was not

1   necessary: OPD had four months to conduct a less suggestive lineup before it even attempted to

2   contact the witness and show him a video of the lineup. *Montgomery*, 150 F.3d at 992-93.

3       C.    **THE RESULTING IDENTIFICATIONS WERE UNRELIABLE**

4           Once an identification procedure is found to be impermissibly suggestive, the Court must

5   assess whether, under the totality of the circumstances, the identification is reliable. *Biggers*, 409 U.S.

6   at 198. Reliability means that the witness's recollection was "[un]distorted." *Brathwaite*, 432 U.S. at

7   112. The factors to be considered include (1) the opportunity of the witness to view the criminal at the

8   time of the crime; (2) the witness's degree of attention paid to the criminal; (3) the accuracy of the

9   witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the

10  time of the confrontation; and (5) the length of time between the crime and the confrontation.

11  *Biggers,* 409 U.S. at 199-200. "Against these factors is to be weighed the corrupting effect of the

12  suggestive identification itself." *Brathwaite*, 432 U.S. at 114 (1977).

13          An examination of these factors demonstrates that there are not sufficient indicia of reliability

14  to outweigh the corrupting effects of the suggestive photospread and physical lineup video.

15          1.    **Witness's Opportunity to View Criminal at the Time of the Crime**

16          The witness could not have had a good opportunity to view the driver. The witness was inside

17  the diner Tom's Kitchen when he claims to have seen the driver in the car, but the car was on the other

18  side of a three-way intersection and the driver would have been on the far side of the car, given the

19  direction the car was pointed. Moreover, as reflected in the video surveillance footage from a security

20  camera inside the same restaurant in which the witness claimed to be, the witness would have had less

21  than roughly five seconds to view the car and driver as they drove past the restaurant.[10] Ex. H

22  [PHOTOS-VIDEO 000023]. It is not possible to see the driver with any clarity in the video. (*Id.*)

23  This factor weighs heavily against a finding of reliability. *United States v. Russell*, 532 F.2d 1063,

24  1066 (6th Cir. 1976) ("There is a great potential for misidentification when a witness identifies a

25  stranger based solely upon a single brief observation, and this risk is increased when the observation

26

27          _____

28          [10] The only copy of that footage provided by the government shows the car driving past in
    slow motion. In slow motion, the car is visible for less than ten seconds, suggesting the car would
    have been visible for roughly five seconds or less in real time.

was made at a time of stress or excitement."); *United States v. Smith*, 429 F.Supp.2d 440, 451

(D.Mass. 2006) (characterizing 45 seconds as negative reliability factor); *compare Simmons*, 390 U.S.

at 385 (perpetrators did not wear masks and were with the victims for up to five minutes); *Brathwaite*,

432 U.S. at 100-101 (witness engaged in a hand-to-hand transaction with perpetrator for five to seven

minutes). *Biggers*, 409 U.S. at 200 (rape victim was with perpetrator for 15-30 minutes).

### 2. Witness's Degree of Attention

The witness's degree of attentiveness to the driver's face also weighs against a finding of

reliability. The witness could not have been focused on the driver's face, as the witness described

seeing, just moments before, two men run after and shoot another person. Ex. A; *see* Clifford &

Hollin, Effects of the Type of Incident and the Number of Perpetrators on Eyewitness Memory, 66 J.

Applied Psychol. 364, 367 (1981) (witnesses to violent event are less reliable in their identifications

than witnesses to nonviolent event). Stress has been uniformly recognized to distort witnesses's

perceptions. *See e.g.*, *Thigpen v. Cory*, 804 F.2d 893, 897 (6th Cir. 1986) ("This court has previously

noted the important effects stress or excitement may have on the reliability of an identification.");

Weiten, Psychology: Themes and Variations, Briefer Version, 230, 289-90 (7th ed. 2008) (high levels

of stress tend to substantially impair eyewitness memory because the stress activates the eyewitness's

fight or flight response, which interferes with the eyewitness's ability to pay attention and process

information); *cf. Raheem*, 257 F.3d at 138 ("[i]t is human nature for a person toward whom a gun is

being pointed to focus his attention more on the gun than on the face of the person pointing it.").

### 3. Accuracy of the Witness's Prior Description of the Driver

This factor also weighs against a finding of reliability. Although the witness told OPD officers

after the shooting that the driver had dreadlocks, a goatee, and a mustache, the witness then proceeded

to select Laron Means out of a photospread that same evening. In that photo, Means has short-

cropped hair, no dreadlocks, no discernable goatee or mustache, and looks nothing like Mr. Ellis.

Ex. C at RD 000035-36. The witness's mistaken identification of someone who looks nothing like

Mr. Ellis in a photospread the night of the shooting weighs heavily against a finding of reliability in

the eventual identification of Mr. Ellis. *Compare Biggers*, 409 U.S. at 201 (finding that because the

victim had made no previous identifications of the perpetrator, "her record for reliability was thus a

MOTION TO SUPPRESS PRETRIAL AND
IN-COURT IDENTIFICATIONS
Case No. CR13-00818 PJH

good one, as she had previously resisted whatever suggestiveness inheres in a show-up."). This also demonstrates that the witness did not pay a sufficient degree of attention to the driver.

### 4. Level of Certainty Demonstrated by Witness at Time of Identification

As to the fourth *Biggers* factor, the witness demonstrated *no* certainty, only doubt, in his identification of Mr. Ellis as the driver. With respect to the photospread, the police report concedes that the witness provided only a "partial identification," Ex. D at RD 000350, and, in his statement, the witness stated that the individual in position number 3, Mr. Ellis, merely "resemble[d] driver of the getaway car." *Id.* at RD 000037-39. The evident lack of certainty is underscored by the earlier identification of another individual, who does not resemble Mr. Ellis at all, on the day of the shooting.

Regarding the physical lineup video, the witness placed a "?" on position number four and wrote "I think number four resembles the driver." Ex. D. The witness did not otherwise positively identify the person in position number four as the driver. (*Id.*) The witness's inability to identify Mr. Ellis without any degree of certainty is telling, given that he already identified Mr. Ellis once before. This factor also weighs heavily against a finding of reliability.[11]

### 5. Length of Time between the Crime and the Confrontation

Although the witness claimed, 30 hours after the shooting, that Mr. Ellis "resembled" the driver, that relatively short time loses all significance in light of the witness's identification of another individual roughly six hours after the shooting. *See*, *e.g.*, *Raheem*, 257 F.3d at 139 (fact that identification was made less than three weeks after the crime did not indicate reliability, as the

---

[11] Even if the witness had a high degree of certainty (he plainly did not), the Court should afford little weight to this factor, because in the forty years since *Biggers* was decided, there has developed a scientific consensus that a witness's degree of certainty does not correlate with reliability or accuracy of the identification. *See, e.g.*, Steven Penrod & Brian Cutler, *Witness Confidence and Witness Accuracy: Assessing Their Forensic Relation*, 1 Psych., Pub. Pol. & Law 817, 825 (1995) (concluding "from existing research that under the conditions that typically prevail in short criminal encounters between victims-witnesses and perpetrators, witness confidence in having made a correct identification is, at best, only modestly associated with identification accuracy"); Gary L. Wells & Elizabeth A. Olson, *Eyewitness Testimony*, 54 Ann. Rev. Psychol. 277, 285-290 (2003) (reviewing major developments in the experimental literature relating to the accuracy of eyewitness identifications); Neil Brewer, Amber Keast, & Amanda Rishworth, *The Confidence-Accuracy Relationship in Eyewitness Identification: The Effects of Reflection and Disconfirmation on Correlation and Calibration*, 8 J. Experimental Psych. 44 (2002) (survey finding that 73% of eyewitness experts would testify that "confidence is not a good predictor of identification accuracy").

MOTION TO SUPPRESS PRETRIAL AND
IN-COURT IDENTIFICATIONS
Case No. CR13-00818 PJH

witnesses had identified a different individual less than a week after the crime).  And even if this factor were to tip slightly in favor of reliability, it does not outweigh the other factors (such as the lack of certainty in the identification, the lack of opportunity to clearly view the driver, the degree of attention paid to the driver's face).

With respect to the physical lineup video, the witness did not view that until more than four months after the shooting, making the resulting identification inherently unreliable.  *See, e.g.*, *Biggers*, 409 U.S. at 201 (lapse of seven months between incident and identification "would be a seriously negative factor"); *compare Brathwaite*, 432 U.S. at 115 (where witness identified defendant's photo two days after the incident, Court was not concerned with "the passage of weeks or months between the crime and the viewing of the photograph").

### D.     THE IDENTIFICATIONS MUST BE SUPPRESSED

As set forth above, all but one of the *Biggers* factors weigh against the conclusion that the identifications were reliable.  And the fifth factor, which may tilt slightly in favor of reliability with respect to the photospread, is rendered virtually worthless by the prior identification of someone different.  As such, the bare indicia of reliability, to the extent there are any, are outweighed by the corrupting effect of the suggestive photospread.  *See Perry*, 132 S.Ct. at 719.  Because the photospread and physical lineup video were unnecessarily suggestive and produced unreliable identifications, the Court should preclude the government from presenting those identifications at trial, as they "give rise to a very substantial likelihood of irreparable misidentification."  *Simmons*, 390 U.S. at 384.

### E.     IN-COURT IDENTIFICATION MUST ALSO BE PRECLUDED

Once it is established that a pretrial identification must be suppressed as unreliable, an in-court identification made by the witness who made the prior, unreliable identification is also inadmissible, unless the government establishes that it is otherwise reliable by setting forth "clear and convincing evidence that the in-court identifications [will be] based upon observations of the suspect other than the [pretrial] identification."  *Wade*, 388 U.S. at 240.  The court must again apply the *Biggers* analysis.  *See, e.g., United States v. Burnette*, 698 F.2d 1038, 1045 (9th Cir. 1983).

In this case, the result of the *Biggers* analysis is the same as it was above:  the eyewitness's

identifications are highly suspect and inherently unreliable. There is no suggestion that the witness had ever seen Mr. Ellis, other than allegedly at the time of the shooting, and there is no basis from which to conclude that in-court identifications would be more reliable than the unduly suggestive out-of-court identifications made by these witnesses. There is simply no way for the government to remove the taint that resulted from the unconstitutionally suggestive photospread and physical lineup procedures. Moreover, the in-court identifications would take place more than two years after the shooting, and would be far less reliable than identifications made closer in time to the shooting. Accordingly, the witness should be precluded from making an in-court identification of Mr. Ellis.

### F.   USE OF THE RECORDED VIDEO LINEUP VIOLATED MR. ELLIS'S SIXTH AMENDMENT RIGHT TO COUNSEL

Although the identification of Mr. Ellis from the recorded video of the physical lineup must be suppressed for the reasons discussed above, it must also be suppressed on the separate ground that use of the video violated Mr. Ellis's right to counsel under the Sixth Amendment of the United States Constitution. The United States Supreme Court has held that a post-indictment lineup is a critical stage in a criminal prosecution at which the Sixth Amendment entitles the accused to the presence of counsel. *Moore v. Illinois*, 434 U.S. 220, 224 (1977); *United States v. Wade*, 388 U.S. 218, 236-37 (1967); *United States v. LaPierre*, 998 F.2d 1460, 1463 (9th Cir. 1993) (right to counsel "attaches to the period during which an accused is within sight of a potential identification witness"). When a live lineup violates a defendant's Sixth Amendment rights, evidence of identifications made at the lineup is subject to a per se exclusionary rule. *Wade*, 388 U.S. at 236-37.

The Ninth Circuit has held that there is no right to counsel for viewing photos of a lineup, *United States v. Barker*, 988 F.2d 77, 78 (9th Cir. 1993), and other courts have held that there is no right to counsel at the showing of a videotape of a physical lineup. *United States v. Amrine*, 724 F.2d 84, 87 (8th Cir. 1983). The Ninth Circuit, however, has made clear that a videotape of a physical lineup that does not show what occurred in the witness room is not an adequate substitute for the presence of defense counsel. *LaPierre*, 998 F.2d at 1464. In other words, the showing of a videotaped physical lineup to a witness after initiation of the formal adversarial process against the defendant violates the defendant's Sixth Amendment right to counsel where defense counsel is not

present and the videotape does not show what happened in the witness room. *Id.*

In the present case, OPD showed the witness the videotape of the physical lineup on May 28, 2013, long after the formal adversarial process was initiated, as Mr. Ellis was arraigned and formally charged on January 24, 2013. The government has not produced any videos showing what happened when the witness was played the video of the physical lineup. *LaPierre* guarantees Mr. Ellis the right to such a video. The failure to provide him with that constitutes a violation of his Sixth Amendment right to counsel and should result in a per se exclusion of any identification made by the witness at that time. *Wade*, 388 U.S. at 236-37.

## **<u>CONCLUSION</u>**

For all of the above reasons, the Court should suppress the out-of-court photospread and video-lineup identifications, as well as any in-court identifications, by the eyewitness in this case.

Respectfully submitted,

BOERSCH SHAPIRO

DATED: February 6, 2015

     */s/ Martha Boersch*
MARTHA BOERSCH