1  BRIAN J. STRETCH (CABN 163973)
   United States Attorney

2

3  BARBARA J. VALLIERE (DCBN 439353)
   Chief, Criminal Division

4  JOSEPH M. ALIOTO JR. (CABN 215544)
   SCOTT D. JOINER (CABN 223313)

5
   Assistant United States Attorneys

6
        1301 Clay Street, Suite 340S
7       Oakland, California 94612
        Telephone: (510) 637-3680
8       FAX: (510) 637-3724
        joseph.alioto@usdoj.gov

9
   Attorneys for United States of America

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                   OAKLAND DIVISION

14

   UNITED STATES OF AMERICA,           )   CR 13-00818 PJH
15                                      )
            Plaintiff,                  )   UNITED STATES' OPPOSITION TO
16                                      )   DEFENDANTS' MOTION TO SUPPRESS
        v.                              )   EVIDENCE OBTAINED FROM CELL SITE
17                                      )   SIMULATOR (Dkt. No. 304)
   PURVIS LAMAR ELLIS, et al.,          )
18                                      )
            Defendant.                  )
19  _____)

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................2

DISCUSSION ........................................................................................................................5

    I.     The Use of The Cell Site Simulator Did Not Violate the Fourth Amendment ...................5

         A.     Standing ...........................................................................................5

         B.     Use Of The Cell Site Simulator Did not Constitute A "Search" ........................5

         C.     Exigent Circumstances Justified Use of the CSS Without An Order
               or Warrant ........................................................................................8

              1.     Officers Followed The Emergency Procedures of the Pen
                     Register Statute ........................................................................8

              2.     Exigent Circumstances Relieved Officers Of The
                     Obligation To Seek A Warrant ...............................................10

         D.     Good Faith: Officers Were Conducting Themselves According To
                Policies and Laws Which They Faithfully Followed ............................13

          E.     Inevitable Discovery: Any Evidence Sought to Be Suppressed
                Would Have Been Recovered Even Without Use of the Cell Site
                Simulator ........................................................................................15

         F.     The Search was A Valid Probation Search ........................................16

         G.     The Cell Site Simulator Did Not Violate Title III ...........................16

    II.     Evidence Obtained from Ellis's Phone Was Lawfully Acquired ....................................16

    III.     No *Franks* Hearing is Merited ........................................................................17

CONCLUSION.....................................................................................................................18

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Dalia v. United States*,
   441 U.S. 238 (1979)................................................................17, 18

*Fisher v. City of San Jose*,
   558 F.3d 1069 (9th Cir. 2009) ..........................................11, 12

*Franks v. Delaware*,
   438 U.S. 154 (1978)...............................................................17

*Illinois v. Krull*,
   480 U.S. 340 (1987)...............................................................14

*In re Application for Order Authorizing Use of a Cellular Telephone Digital Analyzer*,
   885 F. Supp. 197 (C.D. Cal. Apr. 19, 1995) ....................15

*In re Application for an Order Authorizing Installation and Use of a Pen Register and Trap and Trace Device*,
   890 F.Supp.2d 747 (S.D.Tex. June 2, 2012)....................15

*Kentucky v. King*,
   563 U.S. 452 (2011) ..............................................................10

*Kyllo v. United States*,
   533 U.S. 27 (2001) ..................................................................6

*Minnesota v. Carter*,
   525 U.S. 83 (1998)...............................................................6, 7

Silverman v. United States,
   365 U.S. 505 (1961) ................................................................7

*Murdock v. Stout*,
   54 F.3d 1437 (9th Cir. 1995) ..............................................10
   54 F.2d 1441 (9th Cir. 1995) ..............................................10

*Richards v. Wisconsin*,
   520 U.S. 385 (1997)..............................................................17

Silverman v. United States,
   365 U.S. 505 (1961) ................................................................7

*Smith v. Maryland*,
   442 U.S. 735 (1979)..........................................................6, 14

*United States v. Al-Azzawy*,
   784 F.2d 890 (9th Cir. 1985) ..............................................11

*United States v. Alvarez*,
   358 F.3d 1194 (9th Cir. 2004) ............................................14

*United States v. Ankeny*,
   502 F.3d 829 (9th Cir. 2007) ..............................................15

*United States v. Caraballo*,
   831 F.3d 95 (2d Cir. 2016) ............................................................ 12, 13

*United States v. Carpenter*,
   819 F.3d 880 (6th Cir. 2016) ............................................................ 6

*United States v. Crews*,
   502 F.3d 1130 (9th Cir. 2007) ........................................................ 13, 15

*United States v. Echegoyen*,
   799 F.2d 1271 (9th Cir. 1986) ........................................................ 11

*United States v. Gilliam*,
   842 F.3d 801 (2d Cir. 2016) ............................................................ 13

*United States v. Graham*,
   824 F.3d 421 (4th Cir. 2016) ............................................................ 6

*United States v. Jones*,
   565 U.S. 400 (2012) ........................................................................ 7, 8

*United States v. Karo*,
   468 U.S. 705 (1984) ........................................................................ 6

*United States v. Knotts*,
   460 U.S. 276 (1983) ........................................................................ 6, 7

*United States v. Lai*,
   944 F.2d 1434 (9th Cir. 1991) ........................................................ 10

*United States v. Lambis*,
   197 F.Supp. 3d 606 (SDNY 2016) ................................................ 14

*United States v. Lancellotti*,
   761 F.2d 1363 (9th Cir. 1985) ........................................................ 17

*United States v. Lang*,
   149 F.3d 1044 (9th Cir. 1998) ........................................................ 15

*United States v. Leon*,
   468 U.S. 897 (1984) ........................................................................ 13, 14

*United States v. McConney*,
   728 F.2d 1195 (9th Cir. 1984) ........................................................ 11

*United States v. Patrick*,
   842 F.3d 540 (7th Cir. 2016) .......................................................... 5, 17

*United States v. Payner*,
   447 U.S. 727 (1980) ........................................................................ 5

*United States v. Riley*,
   858 F.3d 1012 (2017) ...................................................................... 7

*United States v. Stanert*,
   762 F.2d 775 (9th Cir. 1985) .......................................................... 18

*United States v. Takai,*
    943 F.Supp.2d 1315 (D. Utah 2013).................................................................. 12, 15

*Warden v. Hayden,*
    387 U.S. 294 (1967).............................................................................................. 11

*Wong Sun v. United States,*
    371 U.S. 471 (1963).............................................................................................. 17

## FEDERAL STATUTES, RULES AND REGULATIONS

18 U.S.C. § 3121 .......................................................................................................... 1

18 U.S.C. § 3122 (b) .................................................................................................... 18

18 U.S.C. § 3125 ............................................................................................................ 9

18 U.S.C. § 3127(3) ....................................................................................................... 9

18 U.S.C. § 3127(4) ....................................................................................................... 9

## STATE CASES

*Riley v. California,*
    134 S.Ct. 2473 (2014)............................................................................................. 7

## OTHER AUTHORITIES

U.S. Lexis 14046......................................................................................................... 15

**INTRODUCTION**

Four gang members ambushed a young man in broad daylight, shooting him through the forehead from close range. The next day, those same men jumped, pistol-whipped and shot a police officer investigating the prior day's shooting. The suspects then fled, armed with their own arsenal, as well as with the guns they had just stolen from the officer. Police surrounded the apartment complex where the men were thought to be hiding. Finding them quickly was essential. By shooting two people in a 27-hour period, the suspects – including the defendant Purvis Ellis – had just demonstrated an ability and willingness to kill others. So, when officers used a cell site simulator ("CSS") [1] to find Ellis, they were entirely justified by the exigent circumstances presented, rightly believing him to be armed and dangerous.

The defendant's motion to suppress is meritless. The courts have not definitively decided whether use of a CSS constitutes a "search" triggering Fourth Amendment protections. But it largely does not matter here, since exigent circumstances amply supported a warrantless use of the device.

Moreover, the officers acted according to the emergency provision of the Pen Register statute, 18 U.S.C. § 3121, *et seq*. They precisely followed the statute's rules and were justified doing so because the CSS had been configured according to the federal definition of a "pen register."

Other exceptions to the warrant requirement also cut against suppressing evidence. For instance, the officers acted in good faith reliance on established law – the pen register statute, Supreme Court precedent, even the FBI policy at the time. Those laws and policies, combined with the dearth of binding case law on the CSS, all justified using the device without a warrant. In addition, the officers would have inevitably discovered everything they ultimately did, even had they never used the CSS. After all, they had the building surrounded by dozens of officers and SWAT team members hours before the CSS was even deployed.

The defendant has not requested suppression of Ellis's cell phone, and he has no basis to do so. This Court has already ruled that his cell phone was properly searched under a number of different legal

---

[1] The defendant uses the product term "Stingray." This brief uses the generic name "cell site simulator" or "CSS."

theories – inevitable discovery, good faith, a valid probation search – all of which would have purged any taint that may have resulted from an unconstitutional use of the CSS.

Finally, there is no basis here for a *Franks* hearing. Use of the CSS was not material to the pen register application; its use was merely a "detail of execution" that the officers had no legal obligation to include in the affidavit. Moreover, the defendant has made no showing that supplementing the omission would have rendered the affidavit deficient. It is doubtful that *Franks* even applies here, since that case concerns the probable cause standard in warrant affidavits, not the relevance standard of pen register orders.

All in all, the defendant complains because the evidence in this case implicates him in serious and brutal crimes. But, neither the law nor the facts support his motion, which must be denied.

## FACTUAL BACKGROUND

In the middle of the afternoon on January 20, 2013 at the intersection of Foothill Boulevard and Seminary Avenue in Oakland, the defendants ambushed an unarmed man and shot him through the forehead as he lay on the ground injured. An eye witness identified Purvis Ellis as the getaway driver of a white Dodge Avenger with license plate 6VEP025.

The following day, police received information that the same vehicle was located in an open parking lot behind the apartment complex at 1759 Seminary Avenue, where Ellis and the defendants lived. An Oakland police officer went to verify the report. He located the getaway car, turned around, and began to exit the lot. But as he attempted to drive off, three men approached. The officer was pulled from his car, pistol-whipped, and shot.

The following timeline outlines the facts relevant to this motion. The Court already made findings of most of these facts in its August 17, 2015 Order. (Dkt. no. 127 at 9-10).

January 21, 2013

6:26 pm    The officer was shot. Medical personnel and police began responding. They secured a perimeter, checked license plates within the perimeter, and looked for witnesses. (Order 8/17/2015 at 9.)

8:32 pm    SWAT learned "susp[ects] might be involved w[ith] 1759 Sem[inary]," and

"mov[ed] in" moments later.  (Order 8/17/2015 at 9.)

10:41 pm      Police "hold[] perimeter on 1759 Sem" and continue their search of nearby houses, roofs, yards, and a creek.  (Order 8/17/2015 at 9.)

11:15 pm      OPD prepared an "Exigent Circumstance Request" to MetroPCS asking for call detail records, "cell sites," and "Pen Register" information.  In the "nature of the emergency" section, OPD wrote: "Targets were involved in attacking and shooting an OPD officer tonight.  Targets fled the scene with their gun and the officer's gun.  Targets are members of a violent West Oakland gang.  Both targets have access to multiple firearms and are actively fleeing.  Either target may shoot Law Enforcement or citizens to help them flee."  The Exigent Circumstances Request was signed by a lieutenant attesting that the information provided was true to the best of his or her knowledge.  (Gov't Ex. A)

11:55 pm      Officers announced they were "done w[ith] yard search" and returned to "focus on 1759 Sem[inary]."  (Order 8/17/2015 at 9.)

January 22, 2013

12:53 am      SWAT re-entered 1759 Seminary.  (Order 8/17/2015 at 10.)

1:05 am       The warrant authorizing search of apartments 108, 110, and 212 was signed by Judge Horner.  (Gov't Ex. B; see also Order 8/17/2015 at 10.)

According to the sworn warrant affidavit, police officers believed Purvis Ellis had been in the driveway when the shooting of the officer occurred.  (Gov't Ex. B at Bates 3409.)  They knew Ellis lived at the 1759 Seminary Avenue apartments.  *Id*.  They believed the officer's guns were located in Ellis's apartment.  *Id*.  Police had information linking Ellis to the white Dodge Avenger that had been used in the shooting the day before.  *Id*. at 3409-3410.  Ellis was known to have control over and ready access to a large number of firearms.  (See Dkt. 63 (unredacted search warrant application).)[2]  Therefore, by 1:05 am on January 22 at the latest, police believed Ellis was armed, had been involved in

_____

[2] The search warrant affidavits in this case were redacted for the safety of witnesses pursuant to this Court's November 18, 2014 Order.  (Dkt no. 62.)

two shootings in the past two days, and was willing to use his firearms on others.

2:11 am        OPD Officer Jason Saunders faxed a "Pen Worksheet" for Ellis's number (510) 904-7509 to MetroPCS. (Gov't Ex. C.) Because the note section of the fax read "start pen register if phone is active and being used," it appears the pen register had not yet been provisioned by the time the fax was sent.

*after* 2:11 am    Once MetroPCS provided OPD with the necessary pen register information, OPD began using its cell site simulator to search for Ellis's phone. (Gov't Ex. G (OPD Operator Decl.) at ¶¶ 11, 12 ("I did not begin operating the device until after OPD obtained [the pen register] information from the telephone provider").)

3:41 am        Apartment 212 was searched. (Order 8/17/2015 at 10.)

The search of apartment 212 revealed three pistols, including both handguns taken from the beaten officer. (Order 8/17/2015 at 10.) Keys to the White Dodge Avenger getaway car from the previous day's shooting were also found in the apartment. (Order 8/17/2015 at 10.)

appx. 7:00 am   OPD contacted FBI and requested assistance in the use of a cell site simulator. (Gov't Ex. I (FBI Operator Decl.) at ¶ 8.)

7:30 am        FBI sent MetroPCS an Exigent Circumstances Request for the pen register information on Ellis's phone. (Gov't Ex. I (FBI Operator Decl.) at ¶ 9; Gov't Ex. D.) In the section explaining the nature of the exigency, FBI wrote "Oakland PD officer shot and suspect is still armed and dangerous." (Gov't Ex. D.)

10:00 am      OPD powered off its cell site simulator and purged all the data. (Gov't Ex. G at ¶¶ 13, 15.) FBI began operating its cell site simulator. (Gov't Ex. G at ¶ 13; Gov't Ex. I at ¶ 10.) FBI's device was operated for approximately one hour before Ellis's phone was located. (Gov't Ex. I at ¶ 10.) During its operation, the FBI agent deployed the device in the publicly accessible areas in the apartment building's interior halls.

10:52 am      Apartment 112 was cleared and the occupants (including Ellis) were escorted

| | | |
|---|---|---|
| 1 | | out. (Gov't Ex. L (radio purge excerpt) bates 4594.) |
| 2 | ~ 11:00 am | FBI powered off its cell site simulator and purged the data. (Gov't Ex. I at ¶ |
| 3 | | 14.) |
| 4 | 12:20 pm | Alameda County Superior Court Judge Horner signed an arrest warrant for Ellis. |
| 5 | | (Gov't Ex. E.) |
| 6 | time unk. | Judge Horner signed a Court Order authorizing the pen register information |
| 7 | | obtained under the exigent circumstance requests. (Gov't Ex. F.) The |
| 8 | | unredacted affidavit attached to the pen register application revealed how |
| 9 | | officers learned that (510) 904-7509 was a phone used by Ellis. |

## DISCUSSION

**I.     The Use Of The Cell Site Simulator Did Not Violate the Fourth Amendment**

**A.     Standing**

The motion to suppress is brought by "all defendants, by and through . . . counsel of record for Purvis Ellis." (Def. Mot. 1.) However, the motion only challenges the use of a CSS to locate Purvis Ellis's phone, so no other defendant has standing to assert the violation of any Constitutional right. The motion must be denied as to defendants Kincaid and Pennymon on that ground alone.

Additionally, at various parts in his motion, the defendant complains about the cell site simulator's ability to collect signals from phones used by third parties unrelated to this litigation. (Def. Mot. 18, 19 (e.g. "FBI and OPD would be monitoring *everyone's* phone within range").) But again, the defendant is not entitled to invoke the rights of anyone else, and suppression is proper only if the defendant's own rights have been violated. *United States v. Patrick*, 842 F.3d 540, 545 (7th Cir. 2016) citing *United States v. Payner*, 447 U.S. 727 (1980). As the Seventh Circuit has observed in the cell site simulator context, "if the problem with simulators is that they are too comprehensive, that would not lead to suppression – though it might create a right to damages by other persons whose interests were unreasonably invaded." *Id*.

**B.     Use Of The Cell Site Simulator Did Not Constitute A "Search"**

Whether use of a cell site simulator constitutes a "search" for Fourth Amendment purposes is not

necessarily a question this Court needs to answer, since even if it were a search, it was amply justified under the circumstances. That said, the law supports concluding that the device in this case did not affect a search.

The CSS in this case was configured to fall within the federal definition of a pen register. The Supreme Court in *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979) held that use of a pen register is not a search because it reveals the making of a call, and the number called, but not the call's content. Announcing the so-called "third party doctrine," the Court held that an individual has no Fourth Amendment protection "in information he voluntarily turns over to [a] third part[y]." *Id.* The CSS is able to function because is analyzes the varying strengths of signals, but it collects no more data than a pen register. Similarly, the Supreme Court in *United States v. Knotts*, 460 U.S. 276 (1983) held that the government did not conduct a search when it placed a beeper emitting radio signals into items carried by the defendant, since the beeper only revealed the suspect's location. Recent decisions from the Fourth and Sixth Circuit have relied on these precedents to hold that tracking a person via cell site data from phone companies is not a search. *United States v. Graham*, 824 F.3d 421 (4th Cir. 2016) (en banc); *United States v. Carpenter*, 819 F.3d 880 (6th Cir. 2016).

The defendant argues that when a CSS emits signals into a home, it constitutes a search because it reveals details about the interior of the home that could not otherwise by observed by visual surveillance. (Def. Mot. at 15.) He cites *United States v. Karo*, 468 U.S. 705 (1984) ("monitoring a beeper in a private residence, a location not open to visual surveillance, violates the Fourth Amendment rights of those who have a justifiable interest in the privacy of the residence") and *Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("[a]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion"). (Def. Mot. at 15.) The crux of those decisions was that they relied on the defendant being in his home or some other justifiably protected area. But, in this case, Ellis was not in his home. He was located in someone else's apartment, and no evidence has been offered that he had any privacy interest in the room in which he was found. "[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Minnesota v. Carter*, 525 U.S.

83, 90 (1998).

Most recently, a decision last month from the Sixth Circuit held that the use of a real-time GPS tracking device was not a search. In *United States v. Riley*, 858 F.3d 1012, 2017 U.S. App. LEXIS 9900 (June 5, 2017), the court held that "using seven hours of GPS location data to determine an individual's location (or a cell phone's location), so long as the tracking does not reveal movements *within* the home (or hotel room), does not cross the sacred threshold of the home, and thus cannot amount to a Fourth Amendment search." *Id*. at *11 (emphasis in original). That decision rested on the fact that the device tracked the suspect to a hotel, but not to a particular room he had rented for the night, which would have been constitutionally prohibited in light of the suspect's reasonable expectation of privacy in the hotel room. But here, because Ellis was not in his home, and his status in the neighbor's room did not amount to that of an overnight guest, he had no expectation of privacy in the location in which he was found. Thus, no search occurred.

The defendant argues that even if Ellis had no privacy interest in his location, he still had a privacy interest in his cell phone. He cites *Riley v. California*, 134 S.Ct. 2473, 2489-92 (2014). (Def. Mot. at 15.) But, *Riley* held that a user had a reasonable expectation of privacy in a cell phone only because of the obviously private information stored on cellphones: photographs, videos, mail, journal entries, and other information that made up a "revealing montage of the user's life." *Id*. at 2490. However, signals emitted from a phone are not the same, since they are not by their nature private. They reveal nothing about the person and are being transmitted out to the world, or at least to a third-party service provider, just like the beeper signals in *Knotts*.

Moreover, the emission of radio signals by a CSS is not at all like the insertion of a microphone into someone's home. (Def. Mot. at 16 citing *Silverman v. United States*, 365 U.S. 505 (1961).) To begin with, a microphone collects content, while a CSS configured to be a pen register does not. The defendant attempts to transform the emission of radio signals into a trespass by comparing it to the insertion of the microphone into the private dwelling or the installation of a physical GPS tracker onto a car. *United States v. Jones*, 565 U.S. 400 (2012). But as the Supreme Court made clear in *Jones*, "[i]t is important to be clear about what occurred in this case: The Government physically occupied private

property for the purpose of obtaining information." *Jones*, 565 U.S. at 405. The emission of radio signals by a CSS does not "physically occupy private property."

Fortunately, the Court likely does not need to wade into this unresolved area of law, since the search (if it was one), was amply justified in this case.

## C. Exigent Circumstances Justified Use of the CSS Without An Order or Warrant

If using a CSS is a search, a warrant would be needed, unless there were exigent circumstances. Here, the issue is academic. Whether it was a "search" or not, and whether it required a warrant or an order, the facts in this case present a textbook example of exigent circumstances that allowed officers to immediately provision and use the CSS.

By the time the CSS was deployed at approximately 2:30 am on January 22, officers had the following information:

- Ellis was identified by an eye witness as the get-away driver in a brutal attempted murder the day before;

- The same eye witness identified the license plate number of the car Ellis was driving, and that car was located in the rear lot of the apartment building where Ellis lived;

- The next day, an Oakland police officer investigating the get-away car was attacked, beaten, and shot while he stood in the driveway of the apartments;

- Ellis was in the driveway when the assault occurred;

- The guns stolen from the officer were in Ellis's room;

- In the days immediately preceding the shooting, Ellis was in possession of a large number of firearms;

- Ellis was a known member of a gang with a violent history; and

- Ellis lived at the 1759 Seminary Apartment complex, but officers did not know his location.

Given this information, officers acted well within the confines of the law when they activated the devices.

### 1. Officers Followed The Emergency Procedures of the Pen Register Statute

According to federal statute, a "pen register" is "a device or process which records or decodes

dialing, routing, addressing, or signaling information."  18 U.S.C. § 3127(3).  A "trap and trace device" records "incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information."  18 U.S.C. § 3127(4).  Both the OPD and FBI devices used in this case were configured as pen registers and/or trap and trace devices, according to how those devices are defined by law.  (Gov't Ex. J (Am. Chapman Decl.) at ¶ 6; Gov't Ex. I (FBI Operator Decl.) at ¶ 7; Gov't Ex. H (OPD Officer Decl.) at ¶ 5.)  Neither of the devices used in this case were capable of capturing any content.  (Gov't Ex. J at ¶ 7; Gov't Ex. I at ¶ 7; Gov't Ex. H at ¶ 6.)

Since the devices in this case were configured in compliance with the Pen Register statute (Gov't Ex. J at ¶ 7), it follows that the Pen Register statute governed their operation.  When the officers submitted an exigent circumstances request to MetroPCS, they were operating under the authority of the Pen Register statute's "emergency" provision.  The "Emergency Pen Register and Trap and Trace Device Installation" section provides in relevant part:

> [A]ny investigative or law enforcement officer . . . who reasonably determines that
>
> > (1) an emergency exists that involves
> >
> > > (A) immediate danger of death or serious bodily injury to any person, [or]
> > >
> > > (B) conspiratorial activities characteristic of organized crime . . .
> >
> > that requires the installation and use of a pen register or trap and trace device before an order authorizing such installation and use can, with due diligence, be obtained, and
> >
> > > (2) there are grounds upon which an order could be entered . . .
> >
> > may have installed and use a pen register or trap and trace device if, within forty-eight hours after the installation has occurred, or begins to occur, an order approving the installation or use if issues in accordance with section 3123 of this title.

18 U.S.C. § 3125.

The offices followed the provisions in the statute precisely.  They had ample reason to believe an emergency existed and that the safety of officers and/or public citizens was at risk.  They also had ample reason to believe the emergency involved the conspiratorial activities of organized crime.  Using due

diligence, a court order could have taken too long – 34 hours or more – to secure the records OPD needed to locate Ellis's phone expeditiously. (Gov't Ex. K, Saunders Decl. ¶ 2.) Moreover, MetroPCS only processes court ordered data during normal business hours, so OPD would have needed to wait until later in the morning just to begin the process. (According to MetroPCS, "the correct fax number for subpoenas and court orders is 972-860-2635" (Gov't Ex. A at 1), which is only monitored "[f]rom 8:00 am to 5:00 pm CST" (Gov't Ex. A at 2).) Finally, OPD secured an order from the court on the same day of the emergency request, which was within "48 hours" as required by the statute. (Gov't Ex. F (Pen Register Order signed "1/22/2013").)[3] In short, officers followed the law precisely.

### 2. Exigent Circumstances Relieved Officers Of The Obligation To Seek A Warrant

Even if a warrant, instead of an order, were required to use a CSS, the same exigency excused that requirement. An officer may conduct a warrantless search when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 460 (2011). "[E]xigent circumstances relieve the police officer of the obligation of obtaining a warrant." *Murdock v. Stout*, 54 F.3d 1437, 1441 (9th Cir. 1995). For the "search" to have been lawful, the government must prove, first, that probable cause supported it, and second, that exigent circumstances justified conducting it without a warrant. *United States v. Lai*, 944 F.2d 1434, 1441 (9th Cir. 1991).

Courts should be mindful that "probable cause in exigency cases 'must be applied by reference to the circumstances then confronting the officer, including the need for prompt assessment of sometimes ambiguous information concerning potentially serious consequences.'" *Murdock*, 54 F.2d at 1441, citing Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.6(a), at 698 (2d ed. 1987). In determining whether officers had probable cause to search, the Ninth Circuit "examine[s] the totality of the circumstances known to the officers at the time they [searched]." *Murdock*, 54 F.2d at 1441. "Probable cause requires only a fair probability or substantial chance of

---

[3] The defendant argues that "the pen register order . . . was apparently signed after the FBI or OPD began using a Stingray so could not have authorized its use by either agency." (Def. Mot. at 19.) This argument reflects a misunderstanding of the statute and a failure to appreciate that the officers were acting properly and according to the law's requirements.

criminal activity, not an actual showing that such activity occurred." *Id*.

Exigent circumstances are "those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984). The Ninth Circuit has also defined exigent circumstances as "those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search [or arrest] until a warrant could be obtained." *United States v. Al-Azzawy*, 784 F.2d 890, 894 (9th Cir. 1985). "Exigent circumstances necessarily imply that there is insufficient time to get a warrant." *United States v. Echegoyen*, 799 F.2d 1271, 1279 (9th Cir. 1986).

When police are confronted with a suspect who they have reason to believe presents a danger to others, courts permit them to conduct searches and make arrests without a warrant. In *Warden v. Hayden*, 387 U.S. 294 (1967), the seminal Supreme Court case on exigency, an armed robber stole $363 from a local business, and an eye witness told officers the man fled into a building. *Id*. at 298. Officers entered the building without a warrant and arrested the man, while also collecting evidence in the home. The Supreme Court held the warrantless entry lawful: "the Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Id*. at 298-299. It continued, "[s]peed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." *Id*.

Similarly, in *United States v. Al-Azzawy*, 784 F.2d 890 (9th Cir. 1985), police had credible information that a suspect was armed, had threatened others with violence, and was holed up in his trailer. *Id*. at 894. The Ninth Circuit held that police were justified in entering the home, arresting the man and searching the house for weapons to secure the scene – all without a warrant. *Id*. It held, "if the officers reasonably believed that appellee possessed illegal explosives and was in an agitated and violent state, there was sufficiently substantial risk to human life to justify a warrantless search."

In *Fisher v. City of San Jose*, 558 F.3d 1069 (9th Cir. 2009) (en banc), a man was drunk in his

home cleaning his collection of rifles when he was spotted by a security guard. The guard became suspicious, called police, and a more than 12-hour stand-off followed. During that time, the man threatened officers. The police in that case were justified in arresting the suspect in his home without a warrant, even though 12 hours had lapsed, during which time the officers could have ostensibly obtained a warrant. The Ninth Circuit refused to second-guess the officers who had found themselves in a dangerous and untenable situation requiring split-second decisions with potentially life and death consequences. It held, "[r]equiring police in this type of siege environment to obtain an arrest warrant for Fisher, a person who is already under arrest but not yet in full physical custody, serves no practical purpose." Since the police had "ample probable cause" to make the arrest "any warrant obtained by the police would have merely authorized them to do exactly what they were already doing, and indeed, exactly what they were authorized to do: surround Fisher's home and attempt to neutralize the threat that he posed by arresting him. We do not see what a neutral and detached magistrate would have added in helping to peacefully effect Fisher's arrest." *Id*. at 1078.

Courts have also found exigent circumstances in the warrantless use of cell site simulators in cases with facts similar to those here. In *United States v. Takai*, 943 F.Supp.2d 1315 (D. Utah 2013), a gang member was identified in surveillance video as a suspect in a shooting and two robberies on the same day. *Id*. at 1317. Officers learned from gang investigators that the suspect was violent and armed, and his location was unknown. That was enough to justify an emergency application to AT&T for GPS location information on the defendant's phone. *Id*. at 1323.

Similarly, in *United States v. Caraballo*, 831 F.3d 95 (2d Cir. 2016), officers used a cell site simulator without a warrant to find a man thought to be armed and dangerous. In that case, a woman was found executed by gunshot in the woods. *Id*. at 97. Police knew she was Caraballo's associate, and they knew she was afraid of him. She had previously refused to cooperate with police for fear of being killed. *Id*. Police also knew that Caraballo was a drug dealer and that he was likely armed. But, with no other evidence linking Caraballo to the woman's murder, officers began tracking Caraballo's phone to prevent "someone [from] get[ting] hurt or killed." *Id*. The Second Circuit held the search reasonable. The crime committed was grave; the suspect was likely armed; officers did not have a reasonable

opportunity to secure a warrant; pinging Caraballo's phone was a relatively slight intrusion into his privacy and "was not to an established, core privacy value;" and officers pinged Caraballo's phone for just a short time before locating him and turning the machine off. *Caraballo*, 831 F.3d at 105-106. Each of those factors is satisfied in the present case.

Finally, *United States v. Gilliam*, 842 F.3d 801 (2d Cir. 2016) concerned the warrantless use of GPS data to track a phone in a case involving the sex trafficking of a 16 year old girl. Two days after the girl's foster mother reported her missing, the girl's biological mother told an investigator that the defendant said he was planning to take the girl to New York to work there as a prostitute. The Second Circuit held that information alone was legally sufficient to justify an exigent request for GPS data to track the defendant's phone. It reasoned, "Congress has 'deemed it reasonable to subordinate any individual privacy interest in cell phone location information to society's more compelling interest in preventing an imminent threat of death or serious bodily injury.'" *Id*.

In comparison, this case presents a straight-forward example of an exigent circumstance. Officers knew Ellis was involved in the attempted murder the day before. They identified the getaway car in his parking lot. They believed he was involved in beating and shooting an Oakland police officer just hours before. He was known to be armed. He had guns in his apartment. He was a member of a violent gang. And, he was in flight.

### D. Good Faith: Officers Were Conducting Themselves According To Policies and Laws Which They Faithfully Followed

Even if the Court were to find that use of the CSS was a search and that it was not justified without a warrant, exclusion would still not be appropriate because agents and officers reasonably relied on the then-existing law. The exclusionary rule is designed to punish police for improperly compromising a defendant's rights for the sake of investigatory economy. *United States v. Crews*, 502 F.3d 1130, 1136 n.4 (9th Cir. 2007). "The good faith reliance exception recognizes that if the officer is acting as a reasonable officer would and should act in similar circumstances, excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." *Id*. *quoting Leon*, 468 U.S. at 920. Thus, the fruits of a search must not be suppressed if the police acted in good

faith executing a search later deemed to be invalid. *United States v. Leon*, 468 U.S. 897 (1984); *United States v. Alvarez*, 358 F.3d 1194, 1204 n.3 (9th Cir. 2004). The good faith exception applies with equal force to searches by officers in "objectively reasonable reliance on a statute." *Illinois v. Krull*, 480 U.S. 340, 349 (1987).

Since the cell site simulators in this case were configured as pen registers under the federal definition, it was reasonable for the officers to rely on the Pen Register statute. For starters, that is precisely what they were trained to do. According to the FBI policy at the time, a warrant was not required before using a CSS. (Def. Mot. Ex. B (Electronic Surveillance Manual, Dept. of Justice (2005) at 41) (absent exigent circumstances, "a pen register/trap and trace order must be obtained by the government before it can use its own device [i.e. a cell site simulator] to capture the ESN or MIN of a cellular telephone, even though there will be no involvement by the service provider"). The defendant argues that the policy of DOJ is to require agents to first get a warrant. (Def. Mot. at 17 quoting *United States v. Lambis*, 197 F.Supp. 3d 606, 611 (SDNY 2016).) But, that policy change did not occur until three years after the incidents in this case. (Def. Mot. at 17, quoting *Lambis*, citing policy change as "Sept. 3, 2015".)

Officers and agents also relied on the then-existing case law of 2013. In *Smith v. Maryland*, 442 U.S. 735 (1979), the Supreme Court held that use of a pen register is not a search because it reveals the making of a call, and the number called, but not the call's content. Because the same is true of cell site simulators configured as pen registers, officers and agents reasonably believed no warrant was required.

Since the CSS technology was still relatively new in 2013, there were simply no binding cases to direct agents and officers to disregard *Smith v. Maryland* and get a warrant. According to the government's research, only a few federal pre-2013 cases referenced "cell site simulator," "digital analyzer," "triggerfish," or "stingray" in a relevant context. (The government found no such cases in California courts.) Of the scant federal opinions, the United States is aware of just two that discussed whether a CSS required a warrant. First, a federal Magistrate Court in California held that a warrant was not required before using a digital analyzer. It cited *Smith v. Maryland* and ruled that "[n]umbers dialed by a telephone are not the subject of a reasonable expectation of privacy, and their interception does not

violate the 4th Amendment." *In re Application for Order Authorizing Use of a Cellular Telephone Digital Analyzer*, 885 F. Supp. 197, 199-200 (C.D. Cal. Apr. 19, 1995) (denying the application on other grounds). A federal Magistrate Court in Texas held the opposite. *In re Application for an Order Authorizing Installation and Use of a Pen Register and Trap and Trace Device*, 890 F.Supp.2d 747 (S.D.Tex. June 2, 2012). If anything, the officers were justified in relying on the California decision that ruled a warrant was not required. But, even so, it is also true that neither of those cases had been reviewed and neither was binding on the officers or agents. The officers were therefore justified in relying on the existing Supreme Court law, the existing federal statute, and their training, acting "as reasonable officer[s] would and should act in similar circumstances." *Crews*, 502 F.3d at 1136, n.4. Therefore, no evidence should be suppressed.

### E. Inevitable Discovery: Any Evidence Sought to Be Suppressed Would Have Been Recovered Even Without Use of the Cell Site Simulator

"The 'inevitable discovery' doctrine . . . provides that if, by following routine procedures, the police would inevitably have uncovered the evidence, then the evidence will not be suppressed despite a constitutional violation." *United States v. Ankeny*, 502 F.3d 829, 834 n.2 (9th Cir. 2007). The doctrine requires the district court "to determine whether a reasonable probability of discovery existed prior to the unlawful conduct, based on the information possessed and investigations being pursued at such time." *United States v. Lang*, 149 F.3d 1044, 1047 (9th Cir. 1998).

Applying this principle in a cell site simulator context, the court in *Takai* concluded that the defendant would have been inevitably discovered because the police were staking out his location when the CSS was operated. "Defendant would have been found and apprehended even without the assistance of the cellphone GPS pinging data" because "the facts sufficiently demonstrate that this location was already being staked out by [d]etectives." 943 F.Supp.2d at 1324; see also *Phillips v. Mitchell*, No. 04-56411, 2006 U.S. Lexis 14046 (9th Cir. 2006) (unpublished) (were a murder investigation had already begun, an unlawful search did not preclude the finding of a body during a subsequent lawful search, since "the police unquestionably would have pursued the investigation until it reached a successful conclusion, culminating in the lawful discovery of the body").

Here, it is beyond any question the police would have come across Ellis sooner or later, even if no cell site simulator had ever been used. Dozens of Oakland police officers and SWAT members had established a perimeter around 1759 Seminary 6 hours before the cell site simulator was even deployed. They had no intention of leaving until they had cleared the building, searched for evidence, and apprehended suspects.

### F.    The Search Was A Valid Probation Search

This Court has previously ruled that "the search of the contents of the ZTE phone found on Ellis was valid as a probation search." (Order 10/29/2015 (dkt. no. 143) at 19.) Since the search of the contents of Ellis's phone was valid, the less intrusive search of non-content signals emanating from Ellis's phone was likewise valid.

### G.    The Cell Site Simulator Did Not Violate Title III

With no evidence, and in fact with the only evidence overwhelmingly pointing to the contrary conclusion, the defendant claims the officers and agents captured content with the CSS and, indeed, surreptitiously transformed Ellis's phone into "a microphone." (Def. Mot. at 20.) No facts support his lukewarm conclusion that officers "likely" violated Title III. (Def. Mot. at 19.) They didn't. The sworn declarations of four different people state that the CSSs in this case did not capture content. (Gov't Ex. G at ¶ 8; Gov't Ex. H at ¶ 6; Gov't Ex. I at ¶ 13; Gov't Ex. J at ¶¶ 6, 7.)

## II.    Evidence Obtained From Ellis's Phone Was Lawfully Acquired

The defendant is vague about the remedy he seeks through his motion. He claims the evidence "may include" testimony of witnesses. (Def. Mot. at 21.) He also claims generally that "any physical evidence that was seized as a result of the illegal use of the Stingrays must also be suppressed." (Def. Mot. at 21.) But, the defendant does nothing to explain how the CSSs resulted in the collection of any evidence, and the failure speaks for itself.

Nevertheless, while he does not request it, there would be no basis to suppress the phone that was seized from Ellis after his arrest, even if the Court were to grant his motion. The Court has already determined the search of Ellis's phone was valid for a number of different reasons: there was a valid search warrant, the search was a valid probation search, officers relied in good faith on then-existing

law, and the contents of the phone would have been inevitably discovered. (Order 10/29/2015 (dkt. no. 143) at 18-21.) Each of these independent reasons for admissibility would have purged whatever taint may have resulted from an unconstitutional search. *United States v. Lancellotti*, 761 F.2d 1363, 1366 (9th Cir. 1985) (valid warrant executed after an illegal entry purges any taint from the unlawful entry if the warrant relies on information independent of the illegal entry). Here, the search warrant for the phone itself was not premised on *any* information gathered from the cell site simulator, so the phone cannot be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (no suppression where evidence is obtained by a means sufficiently distinguishable from the unlawful search or seizure).

## III. No *Franks* Hearing Is Merited

Finally, Ellis requests a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Before a hearing can be ordered, *Franks* requires the defendant to make a "substantial preliminary showing" that (1) the government made a false or misleading statement; and (2) the affidavit cannot support a finding of probable cause absent the omission. *Franks*, 430 U.S. at 155-56. The defendant fails to satisfy either prong. He made no showing (much less a substantial one) that the omission was misleading, and he does not even attempt to argue that the affidavit would have been deficient absent the omission.

First, the affiant did not deliberately mislead the court. He informed the court that the object of the order was "to assist Oakland Police Department in their attempt to locate Ellis's whereabouts." (Gov't Ex. F at 3573.) So, the only thing the affiant omitted was the manner in which that object would be accomplished. The Seventh Circuit recently held that police officers had no legal duty to inform the court in a warrant application that they intended to use a cell site simulator. *United States v. Patrick*, 842 F.3d 540, 544 (7th Cir. 2016). Citing *Dalia v. United States*, 441 U.S. 238, 258 (1979), the court held, "neither constitutional text nor precedent suggests that 'search warrants also must include a specification of the precise manner in which they are to be executed.'" *Patrick*, 842 F.3d at 544. In fact, "courts cannot limit a warrant so as to foreclose a particular means of execution." *Patrick*, 841 F.3d at 544, citing *Richards v. Wisconsin*, 520 U.S. 385 (1997). "This means that the police could have sought a warrant authorizing them to find Patrick's cell phone and kept silent about how they would do it." *Patrick*, 841 F.3d at 544. A district court in Arizona arrived at the same conclusion in *United*

*States v. Rigmaiden*, 2013 U.S. Dist. LEXIS, 65633, * 60 (D.Ariz. May 8, 2013). Regarding the defendant's claims that the agents misled the court by omitting reference to the CSS, the court wrote, "the Court regards this as a detail of execution which need not be specified under *Dalia*."

Second, "[a] defendant challenging an affidavit must also show that the affidavit . . . supplemented by the omissions would not be sufficient to support a finding of probable cause." *United States v. Stanert*, 762 F.2d 775, 782 (9th Cir. 1985). In this case, since the affidavit was for a court order and not a warrant, a probable cause showing was not required. (This in itself renders *Franks* inapposite to the present situation.) Instead, the affidavit in this case only had to certify that the information sought was "relevant to an ongoing criminal investigation." 18 U.S.C. §3122(b). The defendant cannot show (he didn't even try) that supplementing the affidavit with the omission would have rendered the information sought irrelevant.

Summing up with the district court's words from *Rigmaiden*, omitting reference to the cell site simulator "[was] not material to the probable cause determination, nor did [it] mislead Judge Seeborg as to the object of the search. It implicated only the question of 'how the search would be conducted." *Rigmaiden*, 2013 U.S. Dist 65633 at *61.

## CONCLUSION

For the foregoing reasons, the defendant's motion should be denied.


Dated: July 7, 2017                                      Respectfully submitted,

                                                         BRIAN J. STRETCH
                                                         Acting United States Attorney


                                                         */s/ Joseph M. Alioto Jr.*
                                                         _____

                                                         JOSEPH M. ALIOTO JR.
                                                         SCOTT D. JOINER
                                                         Assistant United States Attorneys