1  BRIAN J. STRETCH (CABN 163973)
   United States Attorney
2
   BARBARA J. VALLIERE (DCBN 439353)
3  Chief, Criminal Division

4  JOSEPH M. ALIOTO JR. (CABN 215544)
   SCOTT D. JOINER (CABN 223313)
5
   Assistant United States Attorneys
6
        1301 Clay Street, Suite 340S
7       Oakland, California 94612
        Telephone: (510) 637-3680
8       FAX: (510) 637-3724
        joseph.alioto@usdoj.gov
9
   Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 13-00818-001 PJH |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT PURVIS ELLIS'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM APARTMENT 212 (Dkt. No. 307) |
| v. | |
| PURVIS LAMAR ELLIS, | |
| Defendant. | |

On January 22, 2013 Oakland Police Department ("OPD") officers executed a search warrant on Purvis Ellis's Apartment 212 at 1759 Seminary Avenue in Oakland. During the search, officers found three blood-spattered handguns, two of which were stolen from an OPD officer shot in the driveway hours earlier.

The defendant first tried to suppress this evidence in the Fall of 2015, challenging the validity of the search warrant. The Court ruled the warrant was valid and denied the motion. (Dkt. no. 143.) Now

he challenges the evidence again, this time contending the United States cannot prove "what legal document OPD [had] in its hands when it conducted the search." (Def. Mot. 3, n.1.) On the contrary, the government already has. A photograph of the warrant taken at scene shows it is the same warrant produced to the defendants over two years ago.

The original warrant was not returned to the court after it was executed. This was the result of an oversight. The failure to return the warrant on time was a ministerial defect to be sure, but it was not one that amounted to a violation of the Fourth Amendment. The defendant claims he was prejudiced by the late return. It is difficult to see why. He has had a copy of the original warrant and warrant return for over two years. Those documents may not have contained a clerk's file stamp, but the defendant cannot articulate how that prejudices him, because it doesn't.

The motion should be denied.

**STATEMENT OF FACTS**

After the defendants in this case were indicted, they had their initial appearances in January, 2014. (Dkt. no. 13-16.) Over the next six months, the United States made eight discovery productions, which included approximately 3,600 pages and 27 CDs of audio and video. According to the minute orders from February, May, and July, 2014, the government had disclosed large volumes of discovery, and the defendants requested additional time to review it. (Dkt. nos. 38, 43, 46.) Defendants were also concerned at that time about problems viewing the electronic media. (Dkt. nos. 43, 46.)

After the initial discovery productions, on September 15, 2014, undersigned counsel for the United States filed a notice of appearance in this case. (Dkt. no. 51.) Two days later, the court conducted a status hearing and specifically discussed the affidavit and search warrant for Apartment 212. (Dkt. 53.) On October 15, 2014, the United States explained that the warrants and affidavits were under seal, but that the government was working toward unsealing and redacting them pursuant to *Roviaro v. United States*, 353 U.S. 53 (1957). (Dkt. no. 56.) The United States submitted proposed redactions at the next status hearing on November 12, 2014. (Dkt. no. 61.) On November 18, 2014, the Court reviewed the affidavits under seal and approved all but a few of the proposed redactions. (Dkt. no. 62.) On December 4, 2014, the United States promptly disclosed the redacted search warrant

affidavit to the defense. The warrant itself was disclosed on May 18, 2015.[1]

Once the search warrants and affidavits had been litigated and resolved, the next phase of the case involved ten months of pretrial motion litigation. (Dkt. nos. 65-143.) The defendants filed some 12 motions, after which the Court ordered supplemental briefing on some issues. The motions were argued on August 5 and October 14, 2015 and denied shortly thereafter. (Dkt. nos. 127, 143.)

Once the pretrial motion phase concluded, the parties promptly returned to the defendants' discovery requests, with an intense focus on the defendants' demands for discovery related to the Cell Site Simulator. (Dkt. no. 136.) The parties met and conferred on all discovery issues for 3 hours on December 3, 2015 and planned to meet again on January 19, 2016. (Dkt. no. 151.) Despite the defendants' current position denigrating the United States' efforts on discovery, on January 6, 2016, the defendants stipulated to the Court that "[t]he parties believe that they have diligently addressed discovery issues to this point and continue to do so." (Dkt. no. 151 at 2.)

The Court referred the parties to the magistrate court to resolve outstanding discovery disputes on December 23, 2015. (Dkt. no. 146.) On February 17, 2016, the parties filed discovery briefs. (Dkt. nos. 158, 159.) The defendants made 129 discovery demands in a 33-page filing. (Dkt. no. 159-1.)

While the defendant's motion fails to acknowledge it, during this time period the United States was responding to a very high number of discovery demands, grouped into categories such as:

1. Chain of custody documents
2. Gang task force files
3. All police records, charges, and allegations regarding any suspect related to Sem City
4. Altered metadata on cell phone photos
5. state court warrants and affidavits
6. cell site simulator documents
7. search warrants on cell phones and extraction of cell phones
8. records of OPD officers' personal phone records

---

[1] Two of the five warrants were disclosed with the affidavits in December, 2014. The other three were inadvertently omitted and disclosed in May, 2015, as soon as the issue was brought to the government's attention.

1          9. records on individual defendants

2          10. PDRD videos

(Dkt. no. 163.) Many of these requests originated from little more than defense inklings of police misconduct. For instance, despite no showing of materiality, the defendants' believed that OPD officers "altered metadata" on search photographs, purposely deleted PDRD footage, or illicitly communicated in "back channels" by using cell phones instead of police radios at the January 21 incident. These three discovery categories, along with the cell site simulator discovery, resulted in substantial amounts of resources spent searching for documents, interviewing employees and litigating the issues in court.

Amidst all this, the government continued to work diligently to find file-stamped copies of the search warrants, at the defendants' request. In its August, 2016 brief to the magistrate court, the United States wrote that it had "produced to the defense copies of what it received from the state court. The government is working with the defense to obtain another copy of the materials in question from the state court in order to address the defendant's concerns." (Dkt. no. 158 at 2.) The United States later obtained certified copies of all the originals in the state court files and produced them to the defendants. (Bates 4911-4922, certified July 8, 2016.) However, not all of the original warrants were in the clerk's files.

On August 8, 2016, the magistrate judge recognized the work the government was doing to obtain file-stamped copies, and it denied the defendants' request for production. (Dkt. no. 215-1 at 2.) At that hearing, the government advised the Court that it would work with the defendants, even though none of the documents were in the United States' possession and were therefore no subject to a Rule 16 order. The court acknowledged the work the United States had done, directing it to "continue its efforts." (*Id*.)

Through August and September, 2016, the United States exchanged approximately two dozen emails with the clerk of court in Alameda County in its efforts to find the file-stamped copies of the warrants. Undersigned counsel even visited the courthouse in person to inquire of the courtroom deputy. In early September, 2016, the original warrants were located in the Oakland police files in FBI custody, and it became apparent that the warrants had never been returned to the court. The warrants

were returned to the state courthouse, file stamped, and produced to the defendants in September, 2016. In November, 2016, counsel for the United States wrote an email to the state court clerk, with counsel for Purvis Ellis copied. The clerk was asked to accommodate defense counsel in a viewing of the original warrants. The clerk agreed. No further inquiry on the subject has been made to the United States.

**APPLICABLE LAW**

The exclusionary rule only exists to deter violations of the Fourth Amendment. That amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Amendment says nothing about suppressing evidence obtained in violation of this command[;] [t]hat rule – the exclusionary rule – is a 'prudential' doctrine, created by this Court to 'compel respect for the constitutional guaranty.'" *Davis v. United States*, 564 U.S. 229, 236-237 (2011) (internal citations omitted). "The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations." *Id*. at 236. "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly unwarranted.'" *Id.*

"Real deterrent value is a 'necessary condition for exclusion,' but it is not 'a sufficient' one." *Davis*, 564 U.S. at 236. "The analysis must also account for the 'substantial social costs' generated by the rule." *Id*. "Exclusion exacts a heavy toll on both the judicial system and society at large[;] [i]t almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence[,] [a]nd its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id*. (internal citations omitted). "Our cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.'" *Id*. (internal citations omitted)."

California Penal Code Section 1534, subdivision (a) governs the return of search warrants and provides, in relevant part, "[a] search warrant shall be executed and returned within 10 days after date of issuance." Penal Code Section 1537 provides, in part, "[t]he officer must forthwith return the warrant to the magistrate, and deliver to him a written inventory of the property taken."

"Though sections 1534 and 1537 outline the procedures to be followed by an officer with respect to search warrants, they do not specifically provide for remedies, if any, in the event of noncompliance."

*People v. Couch*, 97 Cal.App.3d 377, 380 (1979). "Moreover, the 10-day requirement's partial purpose 'to insure that the showing of probable cause which supported issuance of the warrant will still exist' when the warrant is executed is not implicated where the warrant is timely executed but the return is filed late. No statutory remedy exists." *People v. Head*, 30 Cal.App.4th 954, 958 (1994).

When a search warrant is returned late, "the remedy of suppression is available only if the delay violated the Fourth Amendment." *Head*, 30 Cal.App.4th at 958. "No California case has yet held that a late or otherwise faulty return violates the Fourth Amendment." *Id.*[2]

Search warrant return requirements "are ministerial in nature and directed to events arising after the invasion of privacy to which the Fourth Amendment pertains." *Head*, 30 Cal.App.4th at 958. Violations of those requirements "have so far not been held error of Fourth Amendment dimension." *Id*.

According to the *Head* case, the most recent California appellate decision on this topic, "[s]ome cases have suggested that a late return could create Fourth Amendment error should the defendant show adequate prejudice." *Head*, 30 Cal.App.4th at 959, *citing People v. Kirk*, 99 Cal.App.3d 89, 92-94 (1979) and *People v. Couch*, 97 Cal.App.3d 377, 380 (1979). However, "[s]trictly speaking, those suggestions are dicta." *Id*.

In sum, under California law, evidence obtained from a valid warrant cannot be suppressed because of the late filing of a warrant return unless the claimed prejudice implicates Fourth Amendment concerns. *Head*, 30 Cal.App.4th at 960.

## DISCUSSION

### I. The Warrant Used By Officers At The Search Has Already Been Demonstrated

When the United States opposed the defendant's suppression motion in October, 2015, it filed the declaration of OPD officer Eric Milina (dkt. 95-4), a photograph of the redacted warrant left on scene (dkt. 81-1), and a copy of the unredacted warrant produced to the defendants early in the case (dkt. 95-2). In his declaration, Officer Milina stated that he left a redacted version of the warrant at Ellis's residence, per OPD policy:

---

[2] Research indicates this is still the case.

> 3. Also on January 22, 2013, I participated in the search of Apartment 212 at 1759 Seminary Avenue, Oakland, California. Per OPD policy, I left a redacted warrant on the premises.

A comparison of the identifying marks on the warrant produced to the defendants (dkt. 95-2) and the warrant left on scene (dkt. 81-1) prove they are the same – the judge's circled initials touching the left border, his signature above his hand-printed name, and his initials and date touching the lower right border:



The search warrant has already been ruled valid. (Order, dkt. no. 143 at 14.) The officers who

UNITED STATES' OPPOSITION ELLIS'S SECOND MOTION TO SUPPRESS EVIDENCE FROM APT. 212
CR 13-00818 PJH

searched the apartment had the same valid warrant in their possession at the time of the search. A copy of the valid warrant was left at Apartment 212. The defendant's contention that "the government still has not established that OPD was in possession of a particular search warrant *at the time of the search*" (Def. Mot. at 12 (emphasis in original)) is without merit.

## II. The Delay In Returning The Warrant and Search Inventory Was A Ministerial Defect, But Not One That Amounts To A Constitutional Violation Justifying Exclusion

If the filing of a warrant is "ministerial in nature" and "directed to events arising after the invasion of privacy to which the Fourth Amendment pertains," *Head*, 30 Cal.App.4th at 958, then the Fourth Amendment cannot apply here as a matter of law. The defendant in this case has not given any reason to deviate from the law. He has shown no prejudice from the delay. And even if he could, he has not shown how that prejudice could have implicated the Fourth Amendment. It is no surprise that, according to California's decision in *Head*, the late filing of a warrant has never resulted in the exclusion of evidence.

The only prejudice defendant argues he suffered is that his lawyer had to "expend a substantial amount of time trying to track down" the file-stamped warrant. (Def. Mot. 15.) If that amounts to prejudice, than the United States has suffered two-fold. The effort he spent was his own tactical decision, and one he did not have to make. Had he observed that the warrant left at the scene was the same warrant produced to him, he would not have wasted his time. He has made no showing how having the file-stamped copy or even the original warrant would have made any difference.

The defendant claims there are rampant inconsistencies in the search inventories. (Def. Mot. at 15: 8-18.) Even a cursory inspection of the evidence shows his claim is based on an alternative view of the facts.

First, he states Officer Milina's "search warrant inventory from apartment 212 [does not] contain any mention of any guns." (Def. Mot. at 15:11.) Not so. Milina's warrant inventory lists "box w/ 3 Glock pistols." (Def. Ex. G (Bates 4927)):



Consistent with Milina's inventory, Officer Brandwood's chronological report indicates "three firearms were recovered from apartment #212." (Def. Ex. R.) Consistent with both those reports, the OPD Technician Jaecksch was given "three guns" by Officer Milina. (Def. Ex. S.) Consistent with all that, Milina's property report (Def. Ex. T) does not list the guns because he gave them to Technician Jaecksch, who documented them in her report (Bates 3447):



The only thing the defendant got right was that a report Milina wrote after the fact did not document the firearms. (Def. Ex. Q.) But that can be explained; he was likely working off his property report.

The defendant claims these "discrepancies" are "precisely the type of confusion and uncertainty that the return requirement was designed to prevent." (Def. Mot. at 15.) But, none of these things would have been different had the warrant been timely filed. In any event, the discrepancies and uncertainties are overblown, and the only confusion is one created by the defendant's description of the facts.

## CONCLUSION

The motion should be denied.

Dated: July 7, 2017

Respectfully submitted,

BRIAN J. STRETCH
Acting United States Attorney

*/s/ Joseph M. Alioto Jr.*

JOSEPH M. ALIOTO JR.
SCOTT D. JOINER
Assistant United States Attorneys