BOERSCH SHAPIRO LLP
David W. Shapiro (State Bar No. 219265)
Dshapiro@boerschshapiro.com
Martha Boersch (State Bar No. 126569)
Mboersch@boerschshapiro.com
Lara Kollios (State Bar No. 235395)
Lkollios@boerschshapiro.com
1611 Telegraph Ave., Ste. 806
Oakland, CA 94612
Telephone: (415) 500-6640

Attorneys for Defendant
PURVIS LAMAR ELLIS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>vs.<br><br>PURVIS LAMAR ELLIS, et al.<br><br>Defendants. | Case No. CR-13-00818 PJH<br><br>**REPLY TO MOTION TO SUPPRESS EVIDENCE OBTAINED FROM STINGRAY AND FOR *FRANKS* HEARING; AND MEMORANDUM IN SUPPORT**<br><br>Hearing Date: August 2, 2017<br>Hearing Time: 1:30 pm<br>Judge: Honorable Chief Judge Phyllis Hamilton<br>Trial Date: TBD |

## INTRODUCTION

Defendant Purvis Ellis has moved to suppress any and all evidence derived from the Oakland Police Department (OPD) and FBI's use of the two Stingrays deployed in this case because that use required a search warrant, which was not obtained, and no exception to the warrant requirement justified the search conducted with the Stingrays. Because the government has not disclosed, and continues to refuse to disclose, what specific information the Stingrays collected or any *Jencks* materials, the defense does not know at this time what information the government obtained through the use of the Stingrays, but the defense intends to determine that at an evidentiary hearing, or if denied a hearing, at trial. At this time, Mr. Ellis asks that whatever information was discovered through the unlawful use of the Stingrays be suppressed, unless and until the government can prove that that specific evidence is subject to some exception to the warrant requirement of the Fourth Amendment.

What is quite clear from the government's opposition is that Mr. Ellis's motion cannot be resolved without an evidentiary hearing. The government's arguments in opposition rest upon factual assumptions that it has not supported with evidence. For instance, the government claims, in part, that the use of the Stingray was not a search because "Ellis was not in his home." Opp'n, Dkt. 321, at 6. But that claim is neither supported by the record nor consistent with the position the government has taken elsewhere. The government claims that the use of the Stingrays was not a search because the Stingrays were configured to act as pen registers (Opp'n at 6), and yet the government neither defines what that configuration would be nor provides any evidence of what, specifically, the Stingrays were or were not collecting that made them no more than pen registers. The government claims that the evidence obtained through the use of the Stingrays would inevitably have been discovered (Opp'n at 15), and yet the government has refused to divulge to the Court or the defense what that evidence is.

//

//

## FACTUAL BACKGROUND

The government seriously misrepresents the facts of the alleged crimes and Mr. Ellis's alleged role in them, perhaps in an effort to persuade the Court that the ends justify the means. The government states that "four gang members ambushed a young man in broad daylight." Opp'n at 1. That is false. According to OPD reports, the only eyewitness to the shooting saw two shooters, not four. Ex. A. The government adopted that narrative in filings to this Court. Dkt. 98 at 2. Neither the government nor anyone else has ever alleged that Mr. Ellis was one of those shooters. The government then states that "the next day, those same men jumped, pistol-whipped and shot a police officer." That too is false. In prior filings, the government has claimed that only three men, not four, assaulted the victim (who was not known at the time to be a police officer), after seeing two guns in the console of his car. Dkt. 95 at 2. The officer was shown a photograph of Mr. Ellis shortly after the incident and ruled out the possibility that Mr. Ellis was involved in the alleged assault. Nor has the government ever alleged – before its opposition to the instant motion – that Mr. Ellis was involved in the alleged assault. The government then concludes that "[b]y shooting two people in a 27-hour period, the suspects – including the defendant Purvis Ellis – had just demonstrated an ability and willingness to kill others." It is undisputed that Mr. Ellis did not shoot either of the two alleged victims. The government has never alleged otherwise.

## ARGUMENT

The government does not dispute Mr. Ellis's description of the factual background regarding the use of the Stingrays (Mot. to Suppress, Dkt. 304, at 11-13). The government nevertheless asserts that the use of the two Stingray's by OPD and the FBI do not violate the Fourth Amendment because it was not a search or various exceptions to the warrant requirement apply. But the government either misconstrues defendant's argument, ignores relevant precedent, or misapplies precedent and statutes.

### I. THE USE OF THE STINGRAYS WAS A SEARCH REQUIRING A WARRANT

The government claims that the use of the Stingrays was not a search. Opp'n at 5-8. But the government has previously conceded that the use of cell site simulators constitutes a search. *United*

*States v. Patrick*, 842 F.3d 540, 544 (7th Cir. 2016). Judicial estoppel prevents the government from now asserting the contrary position. *ACLU v. Masto*, 670 F.3d 1046, 1065 (9th Cir. 2012) (litigation position conveyed to a court becomes binding in any forum in which the same controversy arises).

Nevertheless, the government now claims that the use of the Stingrays was *not* a search requiring a warrant because the Stingrays "collect[ed] no more data than a pen register." Opp'n at 6. But that is a factual question that has yet to be resolved, cannot be resolved on the present record, and requires an evidentiary hearing. The government's own documents reveal that the Stingrays generally collect much more than a pen register:

> If the cellular telephone is used to make or receive a call, the screen of the digital analyzer/cell site simulator/triggerfish would include the cellular telephone number (MIN), the call's incoming or outgoing status, the telephone number dialed, the cellular telephone's ESN, the date, time, and duration of the call, and the cell site number/sector (location of the cellular telephone when the call was connected).
>
> Digital analyzers/cell site simulators/triggerfish and similar devices may be capable of intercepting the contents of communications . . ."

Ex. B. The Stingray thus collects more information than a pen register or trap and trace, as those terms are defined in 18 U.S.C. § 3127 (pen registers only collects "dialing, routing, addressing or signaling information" and trap and trace device collects "the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing and signaling information"). In other words, pen registers and trap and trace devices only collect information about numbers dialed in or dialed out. While the government states that the Stingray in this case was "configured to fall within the federal definition of a pen register," Opp'n at 6, the government has produced no evidence to substantiate that claim, other than the conclusory affidavits of the OPD and FBI. Thus, while the Amended Declaration of William Chapman states that the FBI has "configured its CSS equipment to function as a pen register/trap and trace device," Gov't Ex. J at 5, he does not state – and could not because he lacks personal knowledge – how the specific Stingrays used here were configured, or, more importantly, what those Stingray's specific capabilities were that made it

able to function only as a pen register or trap and trace. Furthermore, he states that "the equipment used in this case can only record, decode, or capture electronic impulses which identify the originating number of a source of electronic communications or other dialing, routing, signaling and addressing information utilized in the process of transmitting electronic communications." *Id*. Again, he does not appear to have any personal knowledge of how this specific Stingray was configured, and this particular Stingray was obviously configured to do more than simply capture the number and capture dialing and routing information, since it also captured location information, according to the government's own justification for its use.

Building on its false premise that the Stingrays in this case were really just pen registers seeking data collected by a carrier, the government relies on Fourth Circuit and Sixth Circuit cases holding that "tracking a person via cell site data from phone companies is not a search." Opp'n at 6 (citing *United States v. Graham*, 824 F.3d 421 (4th Cir. 2016) (*en banc*); *United States v. Carpenter*, 819 F.3d 880 (6th Cir. 2016)).[1] But that is not what happened here. What happened here is that the OPD and the FBI illegally used two Stingrays without any court *or* carrier authorization to track the location in real time of Mr. Ellis's and others' phones. The issue here is not whether government's use of pen register orders to gather *historical* cell phone records revealing Mr. Ellis's location violated the Fourth Amendment, but whether its use of the Stingrays to gather that and other information in real time required a warrant.

Continuing to build on the false premise that the Stingrays were just pen registers, the government claims that their use was authorized by the two emergency CALEA applications under 18 U.S.C. § 3125. Opp'n at 9. But the two pen register applications on their face do not authorize the use of these two Stingrays, and if the government persists in claiming those applications were obtained to justify the use of the Stingrays, the applications are false and misleading. *See* Gov't Exs.

---

[1] The Supreme Court has granted certiorari in *Carpenter* to resolve the question "whether the warrantless seizure and search of historical cell phone records revealing the location and movements of a cell phone user over the course of 127 days is permitted by the Fourth Amendment." *Carpenter v. United States*, 2017 WL 2407484 (June 5, 2017) (granting petition for certiorari).

A & D. In any event, the law governing emergency applications for pen registers explicitly prohibits the use of a pen register or trap and trace to obtain location information. 47 U.S.C. § 1002(a)(2)(B) ("with regard to information acquired solely pursuant to the authority for pen registers and trap and trace devices . . . such call-identifying information shall not include any information that may disclose the physical location of the subscriber").

Nor does the order purportedly signed by Judge Horner (after-the-fact) authorize the use of the Stingrays. Gov't Ex. F. While that order purports to authorize the installation of a pen register and trap and trace pursuant to 18 U.S.C. § 2703(c) and (d) (the Stored Communication Act), it did not authorize the use of the Stingrays and the application for the order did not disclose the use of the Stingrays. And it did not authorize the use of any device, including pen registers or trap and trace devices, except for a period "of thirty days from the date of this order." Thus, it could not have authorized the use of any device before it was signed on January 22, 2013. Because the government has not established when that order was signed, it cannot be used to justify the use of the Stingrays on January 21 and in the early morning hours of January 22, 2013, even assuming that the order was actually signed by Judge Horner sometime on January 22, 2013. Lastly, the order, like the other search warrants, was never filed nor has the original ever been produced.

Finally, none of the documents proffered by the government authorized the scope of the search executed by the Stingrays. As the district court explained in *United States v. Lambis*, 197 F.Supp. 3d 606, 611 (S.D.N.Y. 2016):

> "If the scope of the search exceeds that permitted by the terms of a validly issued warrant ..., the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *see also United States v. Voustianiouk,* 685 F.3d 206, 212 (2d Cir.2012). Here, the use of the cell-site simulator to obtain more precise information about the target phone's location was not contemplated by the original warrant application. If the Government had wished to use a cell-site simulator, it could have obtained a warrant. *See Karo*, 468 U.S. 705, 718, 104 S.Ct. 3296 ("The argument that a warrant requirement would oblige the Government to obtain warrants in a large number of cases is hardly a compelling argument against the requirement."). And the fact that the Government previously demonstrated probable cause and obtained a warrant for

> CSLI from Lambis's cell phone suggests strongly that the Government could have obtained a warrant to use a cell-site simulator, if it had wished to do so.

The same is true here, and Mr. Ellis's motion to suppress must be granted.

## II. NO EXCEPTION TO THE WARRANT REQUIREMENT JUSTIFIES THE SEARCH

### A. There Were No Exigent Circumstances Excusing the Failure to get a Warrant

While contending that the use of the Stingrays was not a search, the government also claims that the failure to get a warrant was justified by various exceptions to the warrant requirement, primarily by exigent circumstances. That argument is belied by the government's own asserted actions in this case. Despite the alleged exigent circumstances, the government claims that it prepared and obtained three separate search warrants the night of January 21 and 22. If the government had the time and ability to get those warrants, there was no reason it could not have obtained a search warrant to authorize the use of the Stingrays. Moreover, the evidence clearly demonstrates that Mr. Ellis's location was known and confined well before the Stingrays were deployed.

Exigent circumstances exist when officers have reason to believe that circumstances exist that would justify the search – here the use of the Stingrays – as necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, or the escape of the suspect, *and* that there was no time to obtain a warrant before taking action to alleviate the exigencies. *United States v. Good*, 780 F.2d 773, 775 (9th Cir. 1986).; *see also United States v. Lai*, 944 F.3d 1434, 1442 (9th Cir. 1991) (exigent circumstances alone are not enough; government must also show that it could not obtain a warrant in time); *United States v. Manfredi*, 722 F.2d 519, 522 (9th Cir. 1983). The government has failed to make that showing. Here, it cannot be disputed that the government had time to get a warrant because, according to the government, they *did* get search warrants and they did have sufficient time for the pen register orders.

As for any exigencies of the situation, none justified the use of the Stingrays, even if the circumstances may have justified some other Fourth Amendment violation at some earlier time. As the Ninth Circuit has stated:

> To be reasonable, a search under [the exigent circumstances] exception must be limited in scope so that it is "strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (internal quotation marks omitted); *see also United States v. Reyes–Bosque*, 596 F.3d 1017, 1029 (9th Cir.2010) ( "In order to prove that the exigent circumstances doctrine justified a warrantless search, the government must [also] show that ... the search's scope and manner were reasonable to meet the need.").

*United States v. Camou*, 773 F.3d 932, 940 (9th Cir. 2014). The government has not shown that here.

By 8:45 p.m. on January 21, the officers had determined that one, if not all, of the suspects were inside the building at 1759 Seminary and the SWAT team had surrounded the building to "contain any suspects." Ex. C. According to the CAD reports, by 12:45 a.m. on January 22, 2013 OPD believed Mr. Ellis was in the apartment building and, not long afterwards, began using a loudspeaker calling for Mr. Ellis to exit the apartment building.[2] Ex. D. At no time did anyone inside the building fire at the officers or threatened to harm the officers or anyone else. According to the government, the Stingrays were not deployed until after 2:11 a.m., after Mr. Ellis and many others in the building were surrounded, after police were making contact with Mr. Ellis, and long after any exigency had been resolved. And the officers sought and, allegedly, obtained a number of other warrants and applied for a pen register all before the Stingrays were allegedly deployed. There was nothing about the situation that prevented them from seeking court authorization to use the Stingrays.

The cases the government relies upon are inapposite because in this motion Mr. Ellis is not challenging his arrest on January 22, 2013, which was pursuant to a warrant. Nor is he challenging,

---

[2] It's worth noting that according to the CAD reports, at 12:57 a.m. on January 22, OPD stated "110 & 112 NOW 108 ADDED TO APTS IN PLAY," Ex. D, and yet OPD somehow managed to obtain signed search warrants for those apartments only eight minutes later, at 1:05 am when the search warrant the government has produced for apartment 212 was allegedly signed.

in this motion, his earlier seizure and constructive arrest when the building was surrounded and all occupants not free to leave. Thus, *United States v. Al-Aazzawy*, 784 F.2d 890 (9th Cir. 1985) does not aid the government. Nor does *Fisher v. City of San Jose,* 558 F.3d 1069 (9th Cir. 2009), a civil case holding that exigent circumstances justified the defendant's warrantless arrest, provide succor to the government for the same reasons. As for *United States v. Caraballo,* 831 F.3d 95 (2d Cir. 2016), that case did not involve the warrantless use of a Stingray, but rather the officers' proper – and honest – application to Sprint for GPS data. Here, Mr. Ellis is challenging is the government's warrantless use of two Stingrays to monitor and collect data from his phone and seeks to suppress whatever data was obtained or derived from that illegal search, not (at this time) whatever information they obtained from the carriers as a result of their pen register applications.

**B. The Good Faith Exception Does Not Apply**

The government also claims that the officers relied in good faith on their pen register applications and Judge Horner's order under Section 2703. The government argues that the officers reasonably relied on the Pen Register statute. Gov't Opp'n at 14. But in the case of statutes, the good faith exception applies where an officer conducts a search in reasonable reliance on a statute *that is later invalidated. Illinois v. Krull*, 480 U.S. 340, 350 (1987) ("If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written."). The good faith exception does not apply where, as here, the government points to some federal statute that in all likelihood does not apply at all to the circumstances of the search. *See* Section. I., *supra* (describing how the evidence does not support the government's claim that the Stingrays were merely configured to acts as pen registers.). The government urges the Court to do precisely what the Ninth Circuit has prohibited:

> The Government would have us conclude that the good faith exception rests on the police officer's belief that he or she is acting reasonably. We reject this suggestion. Doubtless, a police officer who conducts a search may subjectively believe he or she is acting reasonably. Mere

> reliance on the officer's own judgment, however, does not rise to the level of reasonable reliance required by the Constitution.

*United States v. Warner*, 843 F.2d 401, 405 (9th Cir. 1988).

Had the officers honestly disclosed to the carriers and to Judge Horner the technology they intended to use, and had they used that technology in accordance with the orders, the government might have an argument. But they did not. The officers withheld from the carriers and the court the fact that they were going to use, and had already used, two Stingrays. Given that deceptive behavior, the Court cannot find that the officers had an objective good faith belief that their actions were justified. Moreover, the carriers did not provide the information Mr. Ellis seeks to suppress – the Stingrays did.

As for the government's claim that FBI or DOJ policy at the time did not require a warrant, there is no evidence in this record to support the claim. The government has refused to produce in discovery any of the policies that governed the FBI's or OPD's use of the Stingrays and there is no evidence in the record of what those policies allowed or forbade. But even if there were such evidence, there is no evidence in the record to demonstrate that the officers who deployed the Stingrays subjectively relied on any such policies. *See* Gov't Exs. G, H, I, and J.

### C. The Government Has Failed to Show that Evidence Collected by the Stingray Would Inevitably Have Been Discovered

The government has not shown – and cannot show on this record – that the evidence collected through deployment of the Stingrays would have inevitably been discovered, because the government has not produced nor disclosed to the defense or the Court exactly what information and evidence the Stingrays collected. The Stingrays did not simply collect Ellis's location – the Stingrays were operating for hours and, as the government's own documents show, during their operation they collect dialing, routing, and other information for every phone in the vicinity.

//

//

### D. The Use of the Stingrays was not a Valid Probation Search

The government provides this Court with no legal authority or evidence to substantiate its claim that the deployment of the two Stingrays was a valid probation search.

### E. Mr. Ellis has Standing to Challenge the Use of the Stingrays to Monitor his Phone

The government claims that Mr. Ellis lacks standing to challenge the monitoring and capturing of information about third parties. Opp'n at 5. The government misconstrues the defense argument. The fact that the Stingrays were monitoring and capturing data for everyone within range is an undisputed fact relevant to the nature of the technology that goes to the nature and scope of the intrusion. It is a fact that makes the use of the Stingrays a search and a fact that must be disclosed to an impartial magistrate before being used. The government cannot and does not dispute that Mr. Ellis's privacy was invaded and that his phone was "targeted" and that undisclosed information from his phone was collected and used. Mr. Ellis indisputably has standing.

## CONCLUSION

All evidence derived from the use of the Stingrays should be suppressed. In the alternative, a *Franks* hearing is warranted.

Dated: July 19, 2017

BOERSCH SHAPIRO LLP

_/s/ *Martha Boersch*_______________
Martha Boersch

Attorney for Defendant
PURVIS LAMAR ELLIS